983 F.2d 350
 Fed. Sec. L. Rep. P 97,266, RICO Bus.Disp.Guide 8180
 METROMEDIA COMPANY, Plaintiff-Appellee,
v.
William D. FUGAZY, Travelco, Inc., Fugazy International
Corporation, Roy D. Fugazy, Defendants,
William D. Fugazy, Travelco, Inc., Fugazy International
Corporation, Defendants-Appellants.
William D. FUGAZY, Travelco, Inc., Fugazy International
Corporation, Roy D. Fugazy, Third Party Plaintiffs,
William D. Fugazy, Travelco, Inc., Fugazy International
Corporation, Third Party Plaintiffs-Appellants,
v.
John W. KLUGE, Third Party Defendant-Appellee.
METROMEDIA COMPANY, Plaintiff-Appellee,
v.
William D. FUGAZY, Sr. and Roy D. Fugazy, Defendants,
William D. Fugazy, Sr., Defendant-Appellant.
 No. 1120, Docket 91-7049.
 United States Court of Appeals,
Second Circuit.
 Argued April 24, 1992.
Decided Dec. 17, 1992.
 
 Martin I. Shelton, New York City (Peter C. Neger, Mary Gail Gearns, Shea & Gould, on the brief), for plaintiff-appellee and third-party-defendant-appellee.
 Anthony Princi, New York City (Steven Cooper, Jordan W. Siev, Anderson Kill Olick & Oshinsky, P.C., on the brief), for defendants-third-party-plaintiffs-appellants.
 Before: OAKES*, KEARSE, and WALKER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants-third-party-plaintiffs William D. Fugazy ("William" or "William Fugazy"), Travelco, Inc. ("Travelco"), and Fugazy International Corporation ("International") appeal from so much of a final judgment, entered in the United States District Court for the Southern District of New York following a jury trial of consolidated actions before Robert L. Carter, Judge, as awarded plaintiff Metromedia Company ("Metromedia") a total of $46,661,792.67 in damages. 753 F.Supp. 93. The award included $15,553,930.89 on Metromedia's claim against William Fugazy, Travelco, and International for breach of warranty, the same amount against William on a claim under § 12(2) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77l (2) (1988), and $46,661,792.67 in treble damages against William for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (1988). On appeal, appellants contend that the district court improperly deprived them of a jury trial on the breach-of-warranty claim; William contends that Metromedia's other claims should have been dismissed as a matter of law and that the trial court erred in its instructions to the jury with respect to the fraud and RICO claims. For the reasons below, we reject appellants' contentions and affirm the judgment of the district court.
 
 I. BACKGROUND
 
 2
 At all pertinent times, William Fugazy was, directly or indirectly, the owner of a number of concerns engaged in the ground transportation business, including International, Travelco, and Fugazy Express, Inc. ("Express"). He owned all of the stock of International, a holding company for the other Fugazy companies. International owned 100% of Travelco and 60% of Express; Travelco owned the remaining 40% of Express. William was president of Travelco and International; he was chairman of the board of directors of Express.
 
 
 3
 Metromedia, noncorporate successor-in-interest in 1986 to Metromedia, Inc., was a large conglomerate operating a number of diversified businesses, primarily in the communications and entertainment industries, and had assets of approximately $600,000,000. Third-party-defendant John W. Kluge was chairman and chief executive officer of Metromedia, Inc., until its liquidation, and in 1986 he became a general partner and 97.5% owner of Metromedia. Stuart Subotnick, an executive of Metromedia, Inc., was Metromedia's other general partner.
 
 
 4
 A. The Investment in and Bankruptcy of Express
 
 
 5
 In December 1984, the Fugazy companies were in dire need of capital, and William asked his then-friend Kluge to consider having Metromedia purchase an interest in one or more of them. In January 1985, Kluge asked Subotnick to sign a letter of intent expressing an interest in purchasing Express, a radio-dispatched car business. After signing such a letter, Subotnick and his staff began to explore the financial viability of Express, and conducted, inter alia, an audit, a market analysis, and a "due diligence" investigation.
 
 
 6
 Subotnick returned to Kluge with a report that, though "optimistic" about Express, advised against the acquisition because Subotnick believed "this was not the kind of business we should be in." Kluge responded by having Subotnick inform William that Metromedia would not purchase Express. William urged Kluge to reconsider, however, and after additional analysis Subotnick and his staff concluded that Express was a potentially sound acquisition that could be made profitable with expanded operations and improved management.
 
 
 7
 As a result, on March 21, 1985, Metromedia and appellants entered into a Stock Purchase Agreement ("Agreement") pursuant to which Metromedia acquired newly issued common stock representing an 80% interest in Express. In exchange, Metromedia agreed principally to (1) pay $2,000,000 cash to Express or others on Express's behalf, (2) make a $4,000,000 subordinated loan to Express, (3) guarantee up to $3,000,000 in promotional advances from an automobile company to Express, and (4) cure any default on a loan previously made by Citibank, N.A., to William ("Citibank loan") in the original principal amount of $3,500,000. As discussed in greater detail below, the Agreement contained a section entitled "Representations and Warranties of Express and the Stockholders" with respect to, inter alia, Express's outstanding contracts, its exposure to pending or threatened litigation, and its financial condition.
 
 
 8
 In July 1986, Express filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq. (1988). In March 1987, the proceeding was converted into one under Chapter 7 for liquidation, 11 U.S.C. § 701 et seq. (1988). In the course of the bankruptcy proceeding, Metromedia discovered that in or about January 1987, William had transferred one of Express's assets, to wit, a Federal Communications Commission ("FCC" or "Commission") license and two radio frequencies (collectively "License"), to Fugazy Limousine Limited ("Limousine"), a company owned by William's son, defendant Roy D. Fugazy ("Roy" or "Roy Fugazy"). William had transferred the asset without notice to or permission from the bankruptcy court, and without consideration. Limousine had then obtained approval of the transfer from the FCC by failing to inform the FCC that Express was in bankruptcy. Eventually, in a Memorandum Decision dated May 14, 1990, and filed on May 15 ("Bankruptcy Court Decision"), the bankruptcy court ruled that William had improperly transferred the license "in direct, willful contravention" of the automatic stay imposed at the commencement of the bankruptcy proceeding, see 11 U.S.C. § 362 (1988), and it ordered, inter alia, that William pay attorneys' fees to the bankruptcy trustee. Matter of Fugazy Express, Inc., 114 B.R. 865 (Bankr.S.D.N.Y.1990), aff'd, 124 B.R. 426 (S.D.N.Y.1991), appeal dismissed for lack of jurisdiction, 982 F.2d 769 (2d Cir.1992).
 
 B. The Present Actions
 
 9
 In April 1987, Metromedia commenced the first of the present actions, asserting claims against William, International, Travelco, and Roy Fugazy for misrepresentations and nondisclosure of material facts in connection with the issuance of the Express stock, in violation of, inter alia, § 12(2) of the 1933 Act, § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j (1988), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, along with claims of common-law fraud, negligent misrepresentation, and breach of warranty. It sought, inter alia, $35,000,000 in compensatory damages and $250,000,000 in punitive damages. Defendants asserted various counterclaims against Metromedia and brought third-party claims against Kluge, contending, inter alia, that he had entered into written agreements entitling them to contribution or indemnification for any judgment Metromedia might recover against them.
 
 
 10
 In 1989, Metromedia commenced a second action against William and Roy, alleging that they had engaged in, and conspired to engage in, a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(b)-(d). The complaint alleged that the predicate RICO crimes were bankruptcy fraud, in violation of 18 U.S.C. § 152 (1988); mail fraud, in violation of 18 U.S.C. § 1341 (1988); wire fraud, in violation of 18 U.S.C. § 1343 (1988); and securities fraud, in violation of § 12(2), § 10(b), and Rule 10b-5. It sought damages in the amount of $35,000,000, trebled pursuant to 18 U.S.C. § 1964(c). The district court ordered the actions consolidated.
 
 
 11
 Prior to trial, the court issued a "Joint Consolidated Pre-Trial Order" ("Pretrial Order") itemizing, inter alia, facts that the parties agreed were not in dispute. In it, defendants admitted that as of the date of the Agreement, (1) there were at least six litigations pending against Express or companies for which Express could be held liable, (2) that Express had entered four confessions of judgment, (3) that Express and/or William were in default on certain franchise notes, (4) that the $3,500,000 Citibank loan was in default, (5) that William was aware that Express could be liable for certain liabilities of other Fugazy companies, and (6) that William had represented to others that Metromedia would arrange for the cancellation of prior loan guarantees. Appellants conceded that these facts were not disclosed in their "Representations and Warranties of Express and the Stockholders" in the Agreement.
 
 
 12
 Appellants also admitted that in mid-March 1985, William sent a letter to a Fugazy Continental Corp. creditor in whose favor Express had confessed judgment, urging him to be patient because the Metromedia purchase was within a week of consummation. In the letter, which was introduced in evidence at trial, William asked the creditor not to "upset the apple cart" and stated: "As I explained to you, the auditors played games with ... Express in order to make Express's statement look better."
 
 
 13
 William and Roy admitted in the Pretrial Order that at the time William transferred the Express License to Roy, both had actual knowledge that Express was in bankruptcy. They admitted that the transfer was not authorized by the bankruptcy court.
 
 
 14
 At trial, in support of its securities fraud and RICO claims, Metromedia presented evidence that, inter alia, in January 1985, it had received by mail from Express financial statements for Express and one of its subsidiaries. Subotnick testified that these financial statements contained material misrepresentations on which Metromedia relied in deciding to purchase Express. In particular, a "Consolidating Income Statement for the 9 Months Ended Nov [sic ] 30, 1984" showed Fugazy Express with a nine-month net loss of $2,683,256. While Metromedia's analysts speculated that the loss might perhaps be as high as $4,700,000, they did not anticipate that Express's eventual audited financials would in fact reveal a net loss of $9,912,802 for the fiscal year. Similarly, though appellants gave Metromedia an unaudited consolidated balance sheet as of November 30, 1984, which showed Express as having a net worth of $2,869,890, the audited balance sheet as of February 28, 1985, received by Metromedia months after the purchase was consummated, revealed a net worth of minus $5,530,468.
 
 
 15
 Prior to the purchase, Subotnick wondered whether Express might have liabilities or obligations that had not been disclosed. He testified that William assured him in a face-to-face conversation that "there were no oral obligations. There was nothing that we didn't know about. In fact, he sent me a memo I think the very next day, 10 pages long, that he is disclosing everything; we know about everything; there isn't anything that he hasn't told us about this company." In addition, Subotnick testified that William, whose office was in New York, telephoned him in New Jersey on at least a half-dozen occasions to press for the acquisition. Subotnick's telephone logs, reflecting several conversations with William, were also introduced. Subotnick testified that when Metromedia entered into the Agreement it was unaware of the extent of Express's losses or of its negative net worth of more than $5.5 million. He stated that if he had known the truth as to Express's financial status, Metromedia would not have entered into the Agreement.
 
 
 16
 With respect to documents that defendants contended that Kluge had signed, agreeing to indemnify them, Metromedia introduced expert testimony that the documents had not in fact been signed, and that the alleged Kluge signatures had likely been added by means of xerography. Defendants eventually conceded at trial that most of the documents were "not authentic."
 
 
 17
 C. The Trial Court's Rulings and the Jury Verdict
 
 
 18
 After the close of the evidence, following motions by both sides for directed verdicts on various claims, the court determined a number of issues as a matter of law. Finding that there was no dispute that there were express warranties in the Agreement and that those warranties had been breached, and reading New York law as not requiring any other proof of reliance in such circumstances, the court granted Metromedia's motion for a directed verdict as to appellants' liability on the breach-of-warranty claim.
 
 
 19
 In addition, the district court ruled that the Bankruptcy Court Decision collaterally estopped William from denying that he had engaged in bankruptcy fraud in violation of 18 U.S.C. § 152. That section makes it unlawful for any person "either individually or as an agent or officer of any person or corporation, ... with intent to defeat the provisions of title 11, [to] knowingly and fraudulently transfer[ ] ... the property of such other person or corporation." The bankruptcy court had found that William's conduct constituted a "clear violation" of § 549(a)(2)(B) of the Bankruptcy Code, 11 U.S.C. § 549(a)(2)(B) (1988), Bankruptcy Court Decision at 22, and that it was "serious misconduct" by William "in a less than arms-length transaction" in "connivance" with Roy, id. at 25-26. Accordingly, the district court decided that it would instruct the jury that, in considering Metromedia's RICO claim, the jury must find that William had engaged in bankruptcy fraud, but that whether or not that fraud constituted part of the alleged pattern of racketeering activity would remain a question for the jury to decide.
 
 
 20
 As for the counterclaims asserted by defendants, all but one asserted by William were withdrawn after the close of the evidence, and the court dismissed the one that remained. The court also dismissed one of defendants' two third-party claims against Kluge.
 
 
 21
 The court submitted the rest of the case to the jury in the form of special interrogatories. To the extent pertinent here, the jury found that Metromedia had proven its claims against William under § 12(2) of the 1933 Act and under RICO. As for the predicate acts for the RICO claim, in addition to finding pursuant to the trial court's instruction that William had committed bankruptcy fraud, the jury found that William had committed mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and securities fraud in violation of § 12(2). The jury found that Metromedia had suffered damages in the amount of $15,553,930.89. It denied punitive damages. As to defendants' surviving cross-claim against Kluge for indemnification, the jury found that defendants had not shown that Kluge entered into the claimed agreement.
 
 
 22
 Thereafter, defendants moved for judgment n.o.v. or, alternatively, a new trial. In support of the former, they argued, to the extent relevant here, (1) that Metromedia's § 12(2) claim should have been dismissed because that section was inapplicable and because the evidence did not support the verdict; (2) that that claim could not constitute a RICO predicate unless the violation were willful, and the jury was not instructed as to the need to find willfulness; (3) that the allegations of securities fraud, mail fraud, and wire fraud as RICO predicates should have been dismissed for lack of causation because there was no evidence of reliance by Metromedia itself; and (4) that the allegation of bankruptcy fraud should have been dismissed because Express's License was not an asset of the bankruptcy estate when William transferred it to Roy. In support of their motion for a new trial, appellants argued, inter alia, that the question of whether the warranties that were breached had been "bargained for" should have been submitted to the jury; that the court's instructions to the jury with respect to the RICO claims were erroneous; and that Metromedia had waived any right to assert collateral estoppel with respect to its allegation of bankruptcy fraud, because collateral estoppel had not been pleaded.
 
 
 23
 In an Opinion dated December 5, 1990, and published at 753 F.Supp. 93, the district court denied both motions. Reviewing the trial evidence in the light most favorable to Metromedia as the nonmoving party on the motion for judgment n.o.v., the court rejected all of defendants' challenges to the sufficiency of the evidence. It also rejected most of the legal premises of their motions for dismissal and their challenges to the instructions. Reviewing the evidence under a more relaxed standard on the new trial motion, the court stated that it would not order a new trial unless it were persuaded that prejudicial error had crept into the record or that a substantial injustice had been done, and it concluded that it was not so persuaded. The court noted that though appellants were perhaps correct in their contention that willfulness was a prerequisite for use of a § 12(2) claim as a RICO predicate, it would not grant a new trial on this basis since appellants had failed to raise this issue before the jury began its deliberations.
 
 
 24
 Following the denial of these motions, the court entered an amended judgment ("judgment") in favor of Metromedia (1) against William, Travelco, and International, jointly and severally, in the amount of $15,553,930.89 for breach of warranty, and (2) against William alone in the amount of $46,661,792.67 on the RICO claim, representing treble the amount of damages found by the jury, and including $15,553,930.89 on the claim under § 12(2). The judgment provided that "Metromedia shall not recover more than a total of $46,661,792.67." It dismissed all of Metromedia's other claims and dismissed all counterclaims and third-party claims.
 
 
 25
 This appeal followed, with appellants challenging so much of the judgment as awarded Metromedia damages on its claims for breach of warranty, securities fraud, and racketeering. Appellants have not addressed so much of the judgment as dismissed their counterclaims or third-party claims, and those dismissals are affirmed without discussion.
 
 II. DISCUSSION
 
 26
 On appeal, William, International, and Travelco contend that the district court erred in directing a verdict as to liability on the breach-of-warranty claim. William also contends that the court (1) should have granted his motion for judgment n.o.v. dismissing the § 12(2) claim; (2) erred in ruling that he was collaterally estopped from contending that he had not committed bankruptcy fraud, instead of ruling that Metromedia was collaterally estopped from contending that he had committed such fraud; and (3) erred in its instructions to the jury as to RICO's pattern requirement and the elements of the various RICO predicate acts. For the reasons below, we find no basis for reversal.
 
 A. The Breach-of-Warranty Claim
 
 27
 In the Pretrial Order, appellants admitted (a) that in the "Representations and Warranties of Express and the Stockholders" section of the Agreement, they had warranted that Express had no pending or threatened litigation or outstanding contracts that were not there disclosed; and (b) that in fact there were six such litigations, four confessions of judgment, and a number of contractual obligations that were not there disclosed. Nonetheless, they contend that the district court erred in directing a verdict against them as to liability on Metromedia's breach-of-warranty claim, on the premise that there was a triable issue of fact as to whether the express warranties given by them in the Agreement were "bargained for." We reject their contention.
 
 
 28
 The trial court may direct a verdict where the evidence, viewed in the light most favorable to the nonmoving party, " 'is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.' " Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038-39 (2d Cir.1992) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970)). The framework that governs the district court's decision on a motion for a directed verdict also applies to our review of that decision. See, e.g., Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d at 1039; Powell v. Gardner, 891 F.2d 1039, 1043 (2d Cir.1989); Konik v. Champlain Valley Physicians Hospital Medical Center, 733 F.2d 1007, 1013 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). If, drawing all reasonable inferences in favor of the party that opposed the directed verdict and making all credibility assessments in its favor, there was not sufficient evidence to permit a rational juror to find in its favor, we will uphold the directed verdict.
 
 
 29
 The substantive framework for Metromedia's breach-of-warranty claim is provided by New York law. In the leading case, CBS Inc. v. Ziff-Davis Publishing Co., 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990), the New York Court of Appeals noted that a breach-of-warranty claim is grounded in contract, and it stated that a buyer need not show that he "believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached...." Id. at 503-04, 554 N.Y.S.2d at 453, 553 N.E.2d at 1001. The court noted that it was not suggesting that there need be no reliance; rather, it stated that "the required reliance is established if, as here, the express warranties are bargained-for terms of the seller." Id. at 506 n. 5, 554 N.Y.S.2d at 454 n. 5, 553 N.E.2d at 1002 n. 5. The court stated that an "express warranty is as much a part of the contract as any other term." Id. at 503, 554 N.Y.S.2d at 453, 553 N.E.2d at 1001.
 
 
 30
 Since as a matter of law, an express warranty is as much a part of the contract as any other term, the inclusion in the Agreement here of the "Representations and Warranties of Express and the Stockholders" established that those representations and warranties were part of the bargain reached between Metromedia and appellants. No rational juror could have found that it was not part of the bargain. Indeed, it is noteworthy that appellants in their proposed jury instructions did not ask to have the jury decide such a question. Rather, they asked the court to inform the jury that Metromedia could prevail on its breach-of-warranty claim if it proved (1) the existence of an express warranty, (2) material breach of the warranty, (3) damages proximately resulting from the material breach, and (4) justifiable reliance on the warranty. Neither in their initial submission of this request nor in a slightly amended version thereafter did appellants make any mention whatever of a supposed question as to whether the warranties were "bargained for."
 
 
 31
 The first two questions appellants sought to have the jury consider had been answered by appellants' admissions in the Pretrial Order; the fourth was a matter of law under the ruling in CBS Inc. v. Ziff-Davis Publishing Co. Only the matter of damages was left to be decided, and that question was given to the jury. As the district court noted, appellants advanced no defense to the breach-of-warranty claim, making no showing that they agreed to the warranties as a result of, for example, fraud, mistake, or duress. Accordingly, there was no issue for the jury to decide with respect to appellants' liability on the breach-of-warranty claim, and the district court properly ruled that Metromedia was entitled to recover its damages on that claim as a matter of law.
 
 B. The Section 12(2) Claim
 
 32
 With respect to Metromedia's claim for damages under § 12(2) of the 1933 Act, William contends (a) that the district court should have summarily dismissed this claim on the ground that that section applies only to public offerings, not to a private sale such as this, or (b) that in any event, the court should have granted judgment n.o.v. dismissing it on the ground that there was insufficient evidence that any prospectus or oral communication was instrumental in effecting the sale of the Express stock to Metromedia. These contentions have no merit.
 
 
 33
 To the extent pertinent here, § 12(2) imposes civil liability on any person who
 
 
 34
 offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission).
 
 
 35
 15 U.S.C. § 77l (2). In support of their contention that this section does not apply to private sales, William cites only to general statements about the 1933 Act's legislative history and to various cases stating that the legislation was intended to protect the public. The section has, however, consistently been applied to private as well as public offerings of securities. See, e.g., Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 695 (5th Cir.1971) ("liability under Section 12(2) would not be affected by a finding that the offering was private"); see Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124 (2d Cir.1989) (applying § 12(2) to private sale); Adalman v. Baker, Watts & Co., 807 F.2d 359 (4th Cir.1986) (same); Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093, 1099 (5th Cir.1973) (same), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974); see also L. Loss, Fundamentals of Securities Regulation 1021-22 (1983).
 
 
 36
 With respect to William's contention that he was entitled to judgment n.o.v. on the ground that the evidence was insufficient to establish an offer or sale "by means of" a prospectus or oral communication, our standard of review is identical to that with respect to review of the decision on a motion for directed verdict. See, e.g., Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d at 1038-39; 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524, at 541-42 (1971) ("9 Wright & Miller "). Again we view the evidence in the light most favorable to the party against which the motion was made, see, e.g., Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 889 (2d Cir.1988); Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 167 (2d Cir.1980); Simblest v. Maynard, 427 F.2d at 4, and we may reverse the denial of judgment n.o.v. only if we can conclude that, even making all credibility assessments and drawing all inferences against the moving party, a reasonable juror would have been compelled to accept the view of the moving party.
 
 
 37
 In order to prevail on a claim under § 12(2) for a sale based on an oral communication, a purchaser of securities must show that the communication was "intended or perceived as instrumental in effecting the sale." Jackson v. Oppenheim, 533 F.2d 826, 830 n. 8 (2d Cir.1976). Reliance by the buyer need not be shown, for § 12(2) "is a broad anti-fraud measure and imposes liability whether or not the purchaser actually relied on the misstatement." Akerman v. Oryx Communications, Inc., 810 F.2d 336, 344 (2d Cir.1987). The section requires only "some" causal connection between the alleged communication and the sale, "even if not 'decisive.' " Jackson v. Oppenheim, 533 F.2d at 830 n. 8.
 
 
 38
 The oral statement itself need not be considered in isolation rather than in the context of the total presentation. A seemingly innocuous oral communication not containing affirmative misrepresentations may violate § 12(2) if it is used to emphasize, or induce reliance on, some other representation that is false or misleading. See, e.g., Casella v. Webb, 883 F.2d 805, 808 (9th Cir.1989). Further, § 12(2) reaches false or misleading oral statements communicated intrastate, if in some other respect the mails or instruments of interstate transportation or communication have been used in the sale of the securities. See, e.g., Schillner v. H. Vaughan Clarke & Co., 134 F.2d 875, 877 (2d Cir.1943); Creswell-Keith, Inc. v. Willingham, 264 F.2d 76, 81 (8th Cir.1959) ("a sale of securities induced by oral face to face fraudulent representations, which is completed by means of payment of the purchase price by mail, is protected by section 12(2)"); L. Loss, Fundamentals of Securities Regulation 1027-28 (1983).
 
 
 39
 Here, the evidence was sufficient to permit a rational juror to infer that false and misleading oral communications by William were instrumental in causing Metromedia to purchase the Express stock. Appellants delivered financial statements to Metromedia falsely showing, for example, that Express had a net worth of some $2.9 million when in fact its net worth was minus $5.5 million, and William assured Subotnick in a face-to-face conversation that "[t]here was nothing that [Metromedia] didn't know about." Subotnick testified that William also repeatedly telephoned him and attempted to convince him to consummate the acquisition, describing various Express prospects that William said would improve its business; that prior to the acquisition Metromedia did not know Express's true financial condition; and that had it known, it would not have proceeded with the acquisition. With Subotnick's testimony fully credited and all reasonable factual inferences drawn in favor of Metromedia, the record permitted the jury to find that in orally touting Express's prospects to Subotnick in an effort to persuade Metromedia to purchase Express, William did not disclose the fact that, or the degree to which, Express's financial condition had been misrepresented, and he orally assured Subotnick that nothing had been concealed. The jury was therefore entitled to conclude that certain of William's oral assurances were false statements, that other statements were misleading at least by omission, and that either or both contributed to Metromedia's decision to purchase. The district court thus correctly denied the motion for judgment n.o.v. with respect to this claim.
 
 C. The Civil RICO Claim
 
 40
 William makes a number of challenges with respect to Metromedia's claim under RICO. He contends principally that no predicate acts were properly established because (a) the jury was not instructed that it must find that a § 12(2) violation was willful in order to constitute a RICO predicate, (b) Metromedia, not William, should have been held collaterally estopped from litigating the question of whether he had committed bankruptcy fraud, and (c) the jury was not properly instructed with respect to reliance as an element of mail and wire fraud as RICO predicate acts. He also contends that the court erred in its instructions with respect to RICO's pattern requirement.
 
 
 41
 1. The Section 12(2) Violation as a RICO Predicate Act
 
 
 42
 In addition to his challenges to Metromedia's claim directly under § 12(2), discussed in Part II.B. above, William contends that in order to use a violation of § 12(2) as a predicate for a RICO claim, a plaintiff must prove that the violation was willful. He argues that the district court erred in failing to instruct the jury as to the need to find willfulness in considering the RICO claim. Accepting William's legal premise as valid, see Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 488, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985) (" 'a racketeering activity ... must be an act in itself subject to criminal sanction' (emphasis added)" (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)); Holmes v. Securities Investor Protection Corp., --- U.S. ----, ----, 112 S.Ct. 1311, 1325, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring) (RICO "unmistakably requires" that securities fraud, in order to serve as a predicate act, must have been "sufficiently willful to constitute a criminal violation"); Trane Co. v. O'Connor Securities, 718 F.2d 26, 29 & n. 4 (2d Cir.1983); § 24 of the 1933 Act, 15 U.S.C. § 77x (1988) (imposing criminal liability under § 12(2) only for violations that are "willful"), we nonetheless conclude that in light of the procedural posture of the case and the evidence in the record, there is no basis for reversal.
 
 
 43
 Several sets of procedural principles are pertinent. First, Fed.R.Civ.P. 50(b) generally prohibits judgment n.o.v. on any ground not raised in a motion for a directed verdict. See Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 473 (2d Cir.1985); 5A Moore's Federal Practice 50.08, at 50-83 to 50-86 (2d ed. 1992); 9 Wright & Miller § 2537, at 598. Relief from this requirement is available only to prevent a "manifest injustice." Sojak v. Hudson Waterways Corp., 590 F.2d 53, 54-55 (2d Cir.1978) (per curiam). If the evidence was insufficient but no motion for directed verdict was made, the court could grant a new trial if it were satisfied that justice so required. See, e.g., Russo v. State of New York, 672 F.2d 1014, 1021-22 (2d Cir.1982); Sojak v. Hudson Waterways Corp., 590 F.2d at 54-55; Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814, 816-17 (2d Cir.1970).
 
 
 44
 Second, the civil procedure rules also provide that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The purpose of this Rule is to require the parties to give the trial court an adequate opportunity to cure any error in the instructions before the jury deliberates. See, e.g., 9 Wright & Miller § 2551, at 623. Absent objection, an error may be pursued on appeal only if it is "plain error" that may result in a miscarriage of justice, or in "obvious instances of ... misapplied law." City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981); see, e.g., Air et Chaleur, S.A. v. Janeway, 757 F.2d 489, 494 (2d Cir.1985).
 
 
 45
 Further, under Fed.R.Civ.P. 49(a), a party who failed to object, before the jury retired, to the substance of special verdict questions to be put to the jury has no right to object to such matters on appeal. See, e.g., Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 710 n. 8 (2d Cir.1983). A party who only belatedly noticed the failure to submit a needed question to the jury could ask the court to submit that question in a postverdict interrogatory, and the trial judge would have discretion to submit such an interrogatory. See, e.g., Croce v. Kurnit, 737 F.2d 229, 233-34 (2d Cir.1984).
 
 
 46
 Finally, a motion for a new trial on the ground that the verdict was against the weight of the evidence is committed to the sound discretion of the trial judge. See, e.g., Brady v. Chemical Construction Corp., 740 F.2d 195, 200 (2d Cir.1984); Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978). Assuming that the district court's denial of such a motion is reviewable, but see Dunlap-McCuller v. Riese Organization, 980 F.2d 153, 157 (2d Cir.1992) ("district court order granting or denying a motion for a new trial on the grounds that a verdict is against the weight of the evidence is not reviewable in this Circuit"); Kirschner v. Office of the Comptroller, 973 F.2d 88, 96 (2d Cir.1992) (same); Roberts v. Consolidated Rail Corp., 893 F.2d 21, 26 (2d Cir.1989) (same), such a denial will not be reversed unless the denial constituted an abuse of discretion, Brady v. Chemical Construction Corp., 740 F.2d at 201-02; Bevevino v. Saydjari, 574 F.2d at 684. See generally 11 C. Wright & A. Miller, Federal Practice and Procedure § 2819, at 120 (1973) (noting trend away from view that such decisions are not reviewable at all). Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial. See, e.g., Tennant v. Peoria & P. Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) (jury's credibility assessments are entitled to deference); Wade v. Orange County Sheriff's Office, 844 F.2d 951, 955 (2d Cir.1988).
 
 
 47
 On the present appeal, it is not entirely clear whether William's willfulness argument is based solely on the district court's failure to instruct, which would be a basis for a new trial, or whether he also contends that there was no evidence of willfulness, a potential basis for judgment n.o.v. In the district court, the question was raised in the judgment n.o.v. section of defendants' posttrial motion, not in the section in which appellants alternatively requested a new trial. To the extent that appellants seek to assert that there was no evidence of willfulness and that they were entitled to judgment n.o.v., that argument is procedurally barred. Though at the close of the evidence defendants moved for a directed verdict on a number of grounds, this ground was not among them. Thus, judgment n.o.v. would have been improper, and they are not entitled to entry of judgment in their favor on this appeal.
 
 
 48
 To the extent that the willfulness argument challenged the trial court's instructions or suggested that the verdict was against the weight of the evidence as to willfulness, the argument was more properly one for a new trial, and the trial judge so treated it. Though noting that the contention that willfulness is an element for RICO purposes "may be correct," the court denied a new trial on the ground that appellants had not raised the question before the jury retired to begin its deliberations. The finding of default is clearly supported by the record. Defendants made no request for an instruction that § 12(2) could not serve as a RICO predicate act unless the violation was willful. Their requests to charge included a lengthy proposed instruction with respect to Metromedia's claim directly under that section; that request, properly, did not mention any need for a finding of willfulness. Though defendants also made a number of requests for instructions with respect to the other alleged RICO predicate acts, they made no mention of § 12(2) as a RICO predicate or of any additional questions to be considered by the jury in that connection. Further, defendants did not object to the trial court's instructions with respect to use of the § 12(2) claim as a RICO predicate; and they did not object to the special verdict form, which expressly instructed the jury that if it found in favor of Metromedia on the § 12(2) claim it was required to find that Metromedia had proven securities fraud as a RICO predicate act. Nor did they request that a postverdict interrogatory be submitted to the jury on the question of willfulness.
 
 
 49
 In this appeal, William argues that the trial court should have excused appellants' failure to raise the issue timely in order to avoid "obvious injustice." Given our interpretation of the term "willful" and given the evidence of record, we are not persuaded that a new trial was needed to avoid injustice.
 
 
 50
 Although we have not directly addressed the meaning of the term "willful" in § 24 of the 1933 Act as it would apply to a § 12(2) violation, we have stated that the government could prove that a violation of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1988), was willful within the meaning of § 24 "by proving that a defendant deliberately closed his eyes to facts he had a duty to see." United States v. Benjamin, 328 F.2d 854, 862 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964). In addition, we have more fully explored the meaning of "willful" in connection with prosecutions under § 32(a) of the 1934 Act, 15 U.S.C. § 78ff (1988), the first clause of which is similar to § 24 of the 1933 Act. Compare § 24 of the 1933 Act, 15 U.S.C. § 77x (imposing criminal liability on "any person who willfully violates any of the provisions of this subchapter [1933 Act]") with § 32(a) of the 1934 Act, 15 U.S.C. § 78ff (imposing criminal liability on "[a]ny person who willfully violates any provision of this chapter [1934 Act]"). In United States v. Peltz, 433 F.2d 48 (2d Cir.1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971), we held that a prosecution under the quoted clause of § 32(a) required a showing "that the act [was] wrongful under the securities laws and that the knowingly wrongful act involve[d] a significant risk of effecting the violation that has occurred," id. at 55; see also United States v. Dixon, 536 F.2d 1388, 1397 (2d Cir.1976). Given the similarity of the language of the two statutory provisions, we believe the Peltz test too should be applied in determining whether a violation of § 12(2) was willful. Thus, we conclude that, with respect to oral communications in violation of § 12(2), willfulness may be established by a showing (1) that the defendant either (a) knowingly made false or materially incomplete misleading statements or (b) made false or materially incomplete misleading statements with respect to facts to which he had deliberately closed his eyes but which he had a duty to see, and (2) that he knew that his statements significantly increased the possibility of a sale of the securities in question.
 
 
 51
 We conclude that had the jury been so instructed in the present case, it could easily have found that William's violation of § 12(2) was willful. As discussed in Part II.B. above, William made oral statements falsely assuring Subotnick that all material facts had been disclosed to Metromedia, and he made other oral statements that were materially misleading because of their implicit adoption of, and failure to disclose the falseness of, the financial documents' representations as to Express's condition. As to willfulness, there was a sufficiently great disparity between the Express financial statements given to Metromedia prior to the acquisition (assets of some $11.65 million and liabilities of some $8.77 million) and the postacquisition revelation of its true financial condition (assets of approximately $8.59 million and liabilities exceeding $14 million) to permit the jury to infer that the preacquisition financials were false and that their inaccuracy was not attributable merely to negligence. The jury could also infer that William, given his 100% ownership of, and top executive positions in, International, Travelco, and Express, was aware that Express did not have a net worth of some $3 million, as represented, but instead had a deficit of some $5.5 million. It had been conceded prior to trial that the Fugazy companies were in dire financial straits, and the evidence depicted a William who was desperate for Metromedia to purchase Express. And, if in doubt as to whether the above factors circumstantially bespoke willfulness, the jury could infer from William's own words that his misrepresentations and nondisclosures were intentional and designed to deceive, as in mid-March he wrote that his auditors had "played games with ... Express in order to make Express's statement look better."
 
 
 52
 In sum, the question of willfulness was indeed one for the jury, but the evidence was such that, had the jury been instructed that it must answer that question, a finding of willfulness could not have been set aside for lack of evidence. In all the circumstances, it was within the discretion of the trial court to decline to excuse appellants' failure to ask for an instruction on willfulness and to deny their motion for a new trial.
 
 2. Bankruptcy Fraud
 
 53
 In challenging the district court's ruling that the Bankruptcy Court Decision collaterally estopped him from contending that he had not committed bankruptcy fraud, William contends that as a matter of law his transfer of the Express License to Roy could not constitute bankruptcy fraud because, he claims, the FCC in an October 26, 1988 letter ("FCC Letter") ruled that at the time of that transfer the License was not property of the bankruptcy estate. He also argues that Metromedia waived the right to assert collateral estoppel by failing either to plead it originally or to ask for leave to file a supplemental pleading asserting it, and that he was unduly prejudiced by Metromedia's presentation of evidence as to an issue on which there was to be an estoppel. We reject all of his contentions.
 
 
 54
 The doctrine of collateral estoppel, or issue preclusion, bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits. See, e.g., Gelb v. Royal Globe Insurance Co., 798 F.2d 38, 44 (2d Cir.1986), cert. denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); Zdanok v. Glidden Co., Durkee Famous Foods Division, 327 F.2d 944, 955 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); see generally Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4416, at 136-48 (1981) ("18 Wright & Miller "); Restatement (Second) of Judgments § 27 (1982). Certain of these conditions warrant elaboration for purposes of the present appeal.
 
 
 55
 First, the issue as to which preclusion is sought must be identical to the issue decided in the prior proceeding. Issues of fact may bear the same label without being identical. They are not identical if the legal standards governing their resolution are significantly different. See, e.g., Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 734 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992); Cullen v. Margiotta, 811 F.2d 698, 732 (2d Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).
 
 
 56
 Further, even if the issues in the two proceedings are identical, a decision by an administrative agency cannot be the basis for collateral estoppel unless it was an adjudicative decision. An agency action granting or denying a privilege is not an adjudicative decision unless the agency has made its decision using procedures substantially similar to those employed by the courts. See generally Delamater v. Schweiker, 721 F.2d 50, 53 (2d Cir.1983) (per curiam); Associated Industries of New York State, Inc. v. United States Department of Labor, 487 F.2d 342, 350 n. 10 (2d Cir.1973); 4 Davis, Administrative Law Treatise § 21:3 (2d ed. 1983); Restatement (Second) of Judgments § 83, comment b (1982).
 
 
 57
 As to the need for finality of decision, collateral estoppel, unlike appealability under 28 U.S.C. § 1291 (1988), "does not require a judgment 'which ends the litigation ... and leaves nothing for the court to do but execute the judgment.' " Zdanok v. Glidden Company, Durkee Famous Foods Division, 327 F.2d at 955 (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). Rather the concept of finality for collateral estoppel purposes "includes many dispositions which, though not final in that sense, have nevertheless been fully litigated." Zdanok v. Glidden Company, Durkee Famous Foods Division, 327 F.2d at 955. Whether a judgment that is not final within the meaning of § 1291 "ought nevertheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir.1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). The mere fact that the damages awarded to the plaintiff have not been yet calculated, though normally precluding an immediate appeal, see our companion opinion filed today in In re Fugazy Express, Inc., 982 F.2d 769 (2d Cir.1992), does not prevent use of a final ruling on liability as collateral estoppel. Zdanok v. Glidden Company, Durkee Famous Foods Division, 327 F.2d at 955; 18 Wright & Miller § 4434, at 321 ("Recent decisions have relaxed traditional views of the finality requirement by applying issue preclusion ... to determinations of liability that have not yet been completed by an award of damages or other relief.").
 
 
 58
 When two lawsuits have resulted in inconsistent final decisions of the same issue, the general rule is that "it is the later, not the earlier, judgment that is accorded conclusive effect in a third action." Restatement (Second) of Judgments § 15 (1982). Although we question whether such a rule would be applicable to inconsistent decisions if the second "judgment" were an administrative agency decision and the first were a court decision, we have no doubt that where the court decision is later, it, and not the agency decision, is to be given preclusive effect.
 
 
 59
 These principles defeat William's claims, for the Bankruptcy Court Decision meets all of the requirements for collateral estoppel, and it is unclear that the FCC Letter meets any of them. There is no question that the issues in the present case as to (a) whether the License was property of Express's bankruptcy estate at the time of William's purported transfer and (b) whether William fraudulently transferred the License to Roy's company are among the very questions that were litigated in, and necessary to the decision of, the bankruptcy court. It is also indisputable that William had a full and fair opportunity to litigate these issues in the bankruptcy court. He appeared in that proceeding, conceded that in making the transfer he had acted without authority, and consented to an order entered in September 1987 declaring the assignment null and void and directing the Trustee to convey the License to Metromedia. In its 1990 decision, the bankruptcy court found that the License was bankruptcy estate property and that William had transferred it without permission of or notice to the bankruptcy court, in "connivance" with Roy. There was nothing tentative about the bankruptcy court's decision. See, e.g., Bankruptcy Court Decision at 23 ("The undisputed liability of the transferor, William Fugazy, for the improper transfer of the License is ... a settled matter of the law of this case."). And that decision has been reviewed--and affirmed--by the district court in accordance with procedures established in 28 U.S.C. § 158(a) (1988). The fact that the appeal of that matter from the district court to this Court is being dismissed for lack of appellate jurisdiction does not mean that the bankruptcy court's decision was not sufficiently final for purposes of collateral estoppel.
 
 
 60
 On the other hand, even if there were no bankruptcy court decision, the language of the FCC Letter itself suggests that it could not be the basis for collateral estoppel in favor of William. That letter, which does not appear to have been issued after court-type proceedings, stated in part as follows:
 
 
 61
 .... Express, Inc., licensee of record, assigned the license for KXY-610 to R.D.F. Limousine, who then became the licensee of record for our purposes. Information submitted to us, the Consent Order of the Bankruptcy Court in particular, casts doubt upon the validity of this transaction, and would under other circumstances require an administrative inquiry on our part....
 
 
 62
 Affidavits submitted with the pleadings establish that KXY-610 ceased operations in December, 1986. Under Section 90.157 of our Rules, 47 C.F.R. § 90.157, the license for KXY-610 has therefore cancelled and must be returned to the Commission.
 
 
 63
 The reference to the need, or lack thereof, for "administrative inquiry" suggests that the agency itself treated its ruling as an administrative decision. Moreover, it is hardly clear that a decision as to whether the License was bankruptcy estate property when William transferred it would have been necessary to a regulatory decision as to whether to approve the trustee's sale of the License to Metromedia. Nor is it likely that the regulatory principles shaping such a decision would have been the same as the bankruptcy principles governing what assets are to be considered property of a bankrupt's estate.
 
 
 64
 Further, the regulation cited in the FCC Letter provides that for purposes of return of licenses to the Commission, a broadcast station is considered to have been permanently discontinued if it "has not operated for 1 year or more." 47 C.F.R. § 90.157(c). The inference to be drawn from the FCC's invocation of this regulation and its view that Express ceased operations in December 1986 is not that Express had no property interest in the License in January 1987 but rather that its interest continued until at least December 1987.
 
 
 65
 Other statements in the 1988 FCC Letter support this inference. The Letter states that the License was in fact transferred and that Limousine thereby became the new licensee, implying that in January 1987 the License was indeed, in the FCC's view, a transferrable asset. That implication is also consistent with the facts that in April 1987 the FCC approved the transfer, and in October 1987 it advised the trustee that he could not then sell the License to Metromedia without the consent of Limousine. In sum, after January 1987 the FCC itself treated as belonging to Limousine the very License that had belonged to Express until William transferred it. This treatment belies any supposed FCC ruling that in January 1987 the License was not property of the bankruptcy estate.
 
 
 66
 William's other challenges to the district court's collateral estoppel ruling do not require extended discussion. The waiver argument borders on the frivolous. The bankruptcy court decision was filed on the day the present case went to trial. Metromedia's counsel made reference to the decision in his opening statement to the jury and asserted during trial that the decision collaterally estopped defendants from contesting that there had been bankruptcy fraud. Appellants had as much notice of the claim of estoppel as could reasonably be required.
 
 
 67
 Nor is there merit in the contention that appellants were unduly prejudiced by Metromedia's presentation of evidence in connection with a matter as to which they were collaterally estopped. Though the question of whether William had committed bankruptcy fraud had been determined, Metromedia was nonetheless required to introduce some evidence with respect to that fraud in order to show that it was part of the alleged pattern of racketeering activity.
 
 3. The Mail and Wire Fraud Predicate Acts
 
 68
 William argues that the jury's findings with respect to mail and wire fraud as RICO predicate acts should be reversed because (1) the district court failed to instruct the jury properly as to the required "causal nexus" between these predicate acts and Metromedia's injury, and (2) the evidence adduced by Metromedia was insufficient to support a finding of justified reliance. We find no basis for reversal.
 
 
 69
 RICO provides that "[a]ny person injured in his business or property by reason of" a RICO violation may bring a civil action to recover treble damages. 18 U.S.C. § 1964(c). " 'The phrase "by reason of" requires that there be a causal connection between the prohibited conduct and [the] plaintiff's injury.' " County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1311 (2d Cir.1990) (quoting Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 636 (2d Cir.1989)); see Holmes v. Securities Investor Protection Corp., --- U.S. ----, 112 S.Ct. 1311, 117 L.Ed.2d 532 (section 1964(c) requires plaintiff to establish proximate cause). In the context of an alleged RICO predicate act of mail fraud, we have stated that to establish the required causal connection, the plaintiff was required to demonstrate that the defendant's misrepresentations were relied on. County of Suffolk v. Long Island Lighting Co., 907 F.2d at 1311; see also Brandenburg v. Seidel, 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); Grantham & Mann, Inc. v. American Safety Products, Inc., 831 F.2d 596, 606 (6th Cir.1987).
 
 
 70
 In the present case, the trial court instructed the jury on causation without specifying the role of reliance. It stated as follows:
 
 
 71
 If you find that all of the elements of the alleged violation of Section 1962(b), (c) or (d) ... have been established by a preponderance of the evidence, before you may find for Metromedia, you must also find that Metromedia sustained an injury to its business. Either damages caused by the unlawful acts or damages caused by the pattern of acts, or both, will satisfy th[is] requirement. Damages not caused by the unlawful acts or pattern of acts do not satisfy this requirement.
 
 
 72
 (Trial Transcript 2252 (emphasis added)). Though it would have been preferable to have included an instruction that informed the jury of the relationship between causation and reliance, the absence of such an instruction here provides no basis for reversal. Subotnick testified that he received some of the false financial statements in the mail, that he had numerous telephone conversations with William urging Subotnick to have Metromedia make the purchase, and that if Subotnick had known the extent to which the financial figures provided by William and Express were inaccurate, Metromedia would not have entered into the stock purchase agreement. Thus, there was plainly sufficient evidence for the jury to find causation and reliance.
 
 
 73
 Finally, we reject William's contention that any reliance by Metromedia could not have been justified because it had a team of attorneys and financial experts studying Express's condition. Appellants' misrepresentations and nondisclosures denied Metromedia's advisors access to accurate information, and the record does not suggest that they knew the true state of Express's affairs. The suggestion that Metromedia could not justifiably rely on appellants' representations is meritless.
 
 4. RICO's Pattern Requirement
 
 74
 William challenges the trial court's instruction as to what Metromedia was required to prove in order to establish a "pattern" of racketeering activity within the meaning of RICO. The court told the jury, inter alia, that Metromedia was required to show that William's unlawful acts were neither isolated nor sporadic, that those acts were related to each other, and that they were continuing or constituted a threat of continuing racketeering activity. The court instructed that one way in which Metromedia could meet this burden was by showing that William's unlawful activity was "repeated over a substantial period of time--for example, a few weeks or months." William contends that this was error. While the contention appears to have merit, we conclude that the error was harmless.
 
 
 75
 Though there is no bright line test for determining precisely what period of time is "substantial" for purposes of finding the continuity necessary to establish a RICO pattern, the Supreme Court in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), stated that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." Id. at 242, 109 S.Ct. at 2902. Periods of 19 or 20 months, however, have been held sufficient to support a finding of continuity, see United States v. Pelullo, 964 F.2d 193, 210 (3d Cir.1992) (19 months sufficient); United States v. Stodola, 953 F.2d 266, 270 (7th Cir.1992), (closed-ended period of 20 months sufficient), cert. denied, --- U.S. ----, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992), and "where continuity can be inferred from the jury's findings, an erroneous instruction may constitute harmless error." United States v. Pelullo, 964 F.2d at 209; see United States v. Kotvas, 941 F.2d 1141, 1144-45 (11th Cir.1991).
 
 
 76
 In the present case, the district court's illustration that "a few weeks or months" might constitute a "substantial period of time" was erroneous. The RICO predicate acts found by the jury, however, were not so limited. In addition to the bankruptcy fraud found by the bankruptcy court, the jury found that William had committed three other types of predicate acts--mail fraud, wire fraud, and securities fraud. The record supports inferences that the securities and mail fraud began at least as early as January 1985, when appellants mailed to Subotnick financial statements for Express that significantly overstated its net worth and understated the losses incurred in its recent performance. The unlawful activity continued at least until January 1987, when William committed bankruptcy fraud by transferring one of Express's assets to his son. The jury was instructed that in order to find for Metromedia on the RICO claim it must find that the predicate acts were related, and it presumably so found. The related predicate acts that the jury found proven spanned approximately two years, and the instructions' reference to a few weeks or months was therefore harmless.
 
 CONCLUSION
 
 77
 We have considered all of appellants' arguments on this appeal and have found in them no basis for reversal. The amended judgment of the district court is affirmed.
 
 
 
 *
 Judge Oakes was Chief Judge until July 1, 1992