## U.S. EAST TELECOMMUNICATIONS, INC., Plaintiff–Appellee–Cross–Appellant,

### v.

## US WEST COMMUNICATIONS SERVICES, INC., formerly known as US West Information Systems, Inc., Defendant–Appellant–Cross–Appellee.

Nos. 1763, 1769, Dockets 93–9140, 93–9198.

United States Court of Appeals, Second Circuit.

Argued June 3, 1994.

Decided Nov. 2, 1994.

---

4. Although Judge Tenney based this ratio on the pleadings, he acknowledged that the actual damages may be much lower.

Joel M. Miller, New York City (James P. Rosenzweig, Miller & Wrubel, P.C., of counsel), for defendant-appellant-cross-appellee.

Ralph Pernick, Great Neck, NY (Clifford J. Chu, Hayt, Hayt & Landau, of counsel), for plaintiff-appellee-cross-appellant.

Before: NEWMAN, Chief Judge, OAKES and PRATT, Circuit Judges.

OAKES, Senior Circuit Judge:

This appeal requires us to examine under what circumstances a general contractor may become liable in quasi-contract to a "second-tier" subcontractor with whom it has not contracted. Appellant US West Communications Services, Inc. (formerly known as US West Information Systems, Inc., hereinafter "West"), the general contractor in this case, conducts large-scale telephone installation and maintenance operations. In 1986, the

United States General Services Administration ("GSA") awarded West a contract to upgrade telephone systems in federal offices across the country, including the United States Courthouse in New York City (the "GSA Project"). West subcontracted with Telefacs, Inc., a small telecommunications company headquartered in Houston, Texas, to perform some of the work on the GSA Project in New York. Telefacs in turn hired the appellee, U.S. East Telecommunications, Inc. ("East") (the "second-tier subcontractor"). This litigation ensued after the second-tier subcontract between Telefacs and East began to break down and East sought payment directly from West.

The erosion of relations between Telefacs and East occurred in January of 1987, approximately two months before the conclusion of the New York project, when Telefacs announced to East that, due to tax problems, the IRS was about to shut down its business. In response, East attempted to bypass Telefacs and enter into a contract directly with West. Although it did not manage to obtain a written contract with West, East continued to work on the GSA Project, relying, at least in part, on West's assurances that East would somehow "get paid." The project was completed in late February 1987, and, a month later, Telefacs filed for bankruptcy. When East sought payment from West for work done during January and February 1987, West refused, stating that its only contract was with Telefacs. East's contract was likewise with Telefacs, West reasoned, and accordingly any recovery by East must be solely against Telefacs, in the bankruptcy court. East responded by suing West in the Southern District of New York for breach of contract, fraud, and unjust enrichment.

The district court, Kevin T. Duffy, *Judge,* dismissed East's fraud claim. East cross-appeals the dismissal, and we affirm, as set out below. The parties then stipulated to a trial by jury before Magistrate Judge Theodore H. Katz, and the jury awarded East damages of $439,953.25 plus interest on the alternative grounds of breach of contract and unjust enrichment. On West's motion to set aside the verdict or for a new trial, Magistrate Judge Katz reversed the breach-of-con-

tract verdict, holding that no reasonable jury could have concluded that East and West reached a "meeting of the minds" on the terms of the proposed contract. Furthermore, the court concluded, East's second-tier subcontract with Telefacs was never extinguished, and so any work performed by East was done pursuant to East's contractual obligations to Telefacs, and did not constitute consideration for a separate contract with West.

The court, however, allowed the jury's unjust-enrichment verdict to stand, and it is from this judgment that West now appeals. West contends that it could not have been "enriched" at East's expense since East's second-tier subcontract with Telefacs was never extinguished and thus East's work was performed for the benefit of Telefacs rather than West. We disagree. While, under most circumstances, a second-tier subcontractor cannot recover from a primary contractor for work performed pursuant to the second-tier subcontract, recovery is not precluded under New York law where, as here, the primary contractor has represented to the second-tier subcontractor that it will be paid. Accordingly, we affirm the orders of the district court and magistrate judge and affirm the judgment.

## I. Background

### A. Facts

West is a wholly owned subsidiary of US West, Inc., one of the telephone operating companies formed from the breakup of AT & T. US West, Inc. is incorporated under Colorado law and based outside Denver. East is incorporated under New York law and has its principal place of business in Mount Vernon, New York. Thus, the district court had diversity jurisdiction under 28 U.S.C. 1332 (1988).

The deadline for completion of the New York City area portion of the GSA Project, on which West was a primary contractor, was February 28, 1987. In August 1986, West subcontracted with Telefacs to perform some of the work on the New York portion of the project. West's subcontract with Telefacs prohibited Telefacs from "second-tier subcon-

tracting," that is, hiring another business to perform its obligations. Despite that provision, on November 10, 1986, Telefacs hired East to perform Telefacs' obligations on the New York project.

The manner in which work was billed proved to be an important issue at trial. West's agreement with Telefacs provided for "task" billing, that is, payment of preset amounts for particular jobs. Notwithstanding this agreement, East billed Telefacs on a time-and-materials basis, and Telefacs used East's billing invoices as the bases for its own billing invoices to West, adding a markup to the rates charged by East. Thus, Telefacs submitted its bills to West on a time-and-materials basis, and West, despite continuing wrangling over the proper billing procedure, paid Telefacs' bills. After taking its markup, Telefacs would pay East.

In early December 1986, a check from Telefacs to East bounced. Telefacs quickly covered this bounced check with a new check. Again, in early January 1987, another check from Telefacs to East bounced. Again, Telefacs quickly covered this bounced check—this time with a wire transfer.

Fearing that Telefacs was experiencing financial difficulty and would not be able to perform its obligations under its contract with East, Carmine "Monte" Montemarano,[1] the Treasurer of East, called Charlie Castillo, the Vice–President of Telefacs, to seek assurances that Telefacs would perform its obligations to East. Monte testified that "[w]hat he basically told me was I have a problem here with the IRS in my office and they are closing me down and I don't know whether I'm going to be in business next week or not." Transcript of 10/14/92 at 121. Mike McCarthy, the Vice–President of East, who listened to the conversation on speakerphone, testified that "Mr. Castillo informed us he was upset, he informed us the IRS had shut his doors and he was out of business, and we said—well Carmine said, 'what should we do now', and he said 'go set up your deal with U.S. West. I'm out of business, I can't pay you guys.'" Transcript of 10/20/92 at 11.

Monte testified that he then spoke with George Kotlarchik, West's installation supervisor for the GSA Project in New York, and asked Kotlarchik how East could arrange "getting direct payment" from West. Kotlarchik referred Monte to Mike Marsh, West's New York Operations Manager. Monte testified that he called Marsh and threatened to pull East's workers off the GSA Project in New York if East did not get paid. Marsh responded, according to Monte's testimony, "[W]e will get you paid. We know you are doing work, let me straighten this out." Transcript of 10/14/92 at 124. In addition, Monte testified that he had similar conversations with Mitch Sherman, West's Operations Manager for the Northeast Region, and Bill Stone, a member of West's Subcontractor Resources Group. Both Sherman and Stone assured him, Monte testified, that West would "get [East] paid." *Id.* at 124–26.

According to West's own internal procedures, it could not pay East directly unless East became an approved subcontractor. Therefore, Monte was advised that East must complete the subcontractor application package before it could be approved. Monte responded that he would fill it out but that he preferred to hand-deliver the application to West's headquarters in Denver. On January 27, 1987, Monte and Salvani met with West representatives at West's Denver headquarters and discussed the different ways in which East might get paid for its remaining work on the New York job. Monte testified that he made it clear to West that he would have to pull his men off the job if East was not paid directly on its outstanding invoices and all remaining work. Witnesses at trial had conflicting recollections of West's responses. For instance, Mike McCarthy, East's Vice–President, testified that a West representative, Jan Kabachus, told him, "You're working for us now." Transcript of 10/19/92 at 153. Kabachus, on the other hand, denied making such a statement, and

1. Montemarano was referred to in trial testimony and in the district court's opinion as "Monte," and we will do likewise.

West's Stone testified that he told Monte, "Our relationship [is] with Telefacs, ... and if you have a problem getting paid, then you need to deal with [Telefacs]." Transcript of 10/21/92 at 61.

While witnesses disagreed at trial as to exactly what was said, there was agreement that West representatives suggested several alternative ways in which East might get paid. Three options were raised: (1) West could "get East paid" indirectly, by pressuring Telefacs to pay East's invoices; (2) West could pay East directly by issuing "split checks" to East and Telefacs—one paying East directly for its time and materials, and the other paying Telefacs its mark-up of East's invoices; or (3) West could bypass Telefacs entirely and hire East as an approved subcontractor in place of Telefacs. *See, e.g.,* Transcript of 10/14/92 at 139. While the second and third of these options—payment by split checks and direct payment as a subcontractor—were clearly preferable for East to the first, indirect option, both required certain preliminary steps. That is, West could not issue split checks to Telefacs and East without Telefacs' permission and without lien waivers executed by both parties. Additionally, West was willing to sign East up as a direct subcontractor only if East went through West's formal subcontractor application process, which required East to offer proof of insurance and to post a performance bond.

East, West, and Telefacs agreed on the second option—split checks—as the method of payment for some of East's outstanding invoices for work performed prior to January 1987, and West issued split checks for those invoices. The method of payment for future work, however, was not finalized. Monte testified that he insisted on direct payment by West, and that Kabachus responded by telling him to continue filling out time sheets as before and to send copies of East's invoices to both Telefacs and West. Transcript of 10/14/92 at 138–39.

Before leaving Denver, Monte filled out West's subcontractor application package. Back in New York, however, East experienced difficulties in obtaining a performance bond, one of West's requirements for hiring East as a subcontractor. East continued nevertheless to work on the GSA Project throughout February 1987. Meanwhile, East and West representatives exchanged correspondence in which their understandings about how East was to get paid increasingly diverged. On February 27, the day before the scheduled completion date for the New York portion of the GSA Project, West called East's representatives into West's satellite office in New York and presented them with a letter officially terminating Telefacs and East from the project. The termination letter was addressed to Telefacs, not to East, and advised Telefacs that "notice of termination of your subcontractor [East] should take place immediately." Ex. 29.

Two weeks later, on March 13, 1987, Telefacs filed a Chapter 11 bankruptcy petition. The petition included claims against West for unpaid invoices from the GSA Project, and listed East as a creditor to whom Telefacs owed approximately $400,000. When East contacted Telefacs about payment, Telefacs responded that the money was tied up in bankruptcy court. East then contacted West about the possibility of payment by split checks, but with no greater success. East's invoices for work performed during January and February 1987 went unpaid. This litigation ensued.

## B. Procedural History

East brought suit in the United States District Court for the Southern District of New York on April 29, 1987, claiming damages for fraud, breach of contract, and unjust enrichment. West moved unsuccessfully to dismiss the action for failure to join Telefacs as an indispensable party. It then moved successfully to transfer the action to the Southern District of Texas, where Telefacs' bankruptcy proceeding was pending. West's subsequent motion to consolidate the action with the Telefacs bankruptcy proceeding was denied by Judge DeAnda of the Southern District of Texas, and the case was retransferred to the Southern District of New York in September 1990. In an order dated April 11, 1991, Kevin T. Duffy, *Judge,* granted West's motion for summary judgment on East's fraud and punitive damages claim.

Pursuant to 28 U.S.C. § 636(c) (1988 & Supp. IV 1992) and Fed.R.Civ.P. 73, the parties agreed to trial by jury before Magistrate Judge Theodore H. Katz ("the trial judge"). After a twelve-day trial, the jury returned a verdict for East in the amount of $439,953.25 plus interest for breach of contract, and for the same amount on the alternative ground of unjust enrichment. Judgment was entered on November 4, 1992.

On November 18, 1992, West filed a timely motion to set aside the verdict and for a new trial. On December 18, 1992, the trial judge ordered that West's motion be withdrawn with leave to refile once a trial transcript could be provided to the court. Pursuant to that order, the defendants filed a "renewed" motion to set aside the verdict and for judgment as a matter of law on all causes of action on January 29, 1993. In a comprehensive and well-reasoned opinion dated September 30, 1993, Magistrate Judge Katz granted this motion in part and denied it in part, setting aside the breach-of-contract verdict but allowing the unjust-enrichment verdict to stand. The court also ordered that East's damages be reduced by approximately $3,000.

The trial court overturned the breach-of-contract verdict on two grounds. First, it held, the evidence did not support the jury's conclusion that East and West had reached a "meeting of the minds" sufficient to create a binding oral contract. Not only was there uncontroverted evidence that the terms of payment remained in contention, but no evidence supported the conclusion that West intended to allow East to become a direct subcontractor without completing West's standard application procedure.

The court held, secondly, that any promise by West to pay East directly was unenforceable for lack of consideration. This holding followed from the court's preliminary finding that East's contract with Telefacs had not been extinguished. The contract had not been extinguished, the court found, because (1) Telefacs had not "clearly and absolutely" repudiated the contract, and (2) even if Telefacs had repudiated, East waived its right to treat the contract as terminated by continuing to perform and to look to Telefacs for payment. Given that East, under its contract with Telefacs, was obligated to complete work on the GSA Project, its performance of that work could not, under New York law, constitute consideration for West's promise to guaranty payment to East. *See* *Zervos v. S.S. Sam Houston*, 427 F.Supp. 500, 505 (S.D.N.Y.1976) (performance of an act which the party is already under a legal obligation to perform cannot constitute consideration for a new contract), *aff'd*, 636 F.2d 1202, 1203, 1206 (2d Cir.1980); *Arend v. Smith*, 151 N.Y. 502, 504–05, 45 N.E. 872, 872–73 (1897) (same); 21 N.Y.Jur.2d *Contracts* § 106 (1982) (same). East does not seek review of this aspect of the trial judge's decision.

On October 14, 1993, an Amended Judgment was entered against West in the amount of $436,928.25 plus prejudgment interest, for a total judgment of $692,693.51. On October 29, 1993, West filed a notice of appeal to challenge the partial denial of its post-trial motion, and East filed a timely notice of cross-appeal. In January 1994, this court denied East's motion to dismiss the appeal as untimely. *U.S. East Telecommunications, Inc. v. U.S. West Information Systems, Inc.*, 15 F.3d 261 (2d Cir.1994). Direct appeal from the magistrate judge's order to this court is proper under 28 U.S.C. § 636(c)(3) and Fed.R.App.P. 3.1.

## II. Discussion

West challenges the trial court's denial of its post-trial motion for judgment as a matter of law, or alternatively for a new trial, on the unjust enrichment verdict. East seeks review of Judge Duffy's dismissal of its fraud and punitive damages claim. For the reasons set out below, we affirm both orders.

### Applicable Law

The parties in this case have proceeded on the assumption that New York law is controlling. *See* Opinion of Sept. 30, 1993 ("Opinion") at 16 n. 7, 1993 WL 385810. We do likewise. In seeking to follow New York law, we of course will afford the greatest weight to the decisions of the New York Court of Appeals. However, "where there is 'no decision by th[e New York Court of Ap-

peals] then [we] must apply what [we] find to be the state law after giving "proper regard" to relevant rulings of other courts of the State.'" *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994) (quoting *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967)). Where the law of the state is uncertain or ambiguous, we will endeavor to predict how the highest court of the state would resolve the uncertainty or ambiguity. *See Travelers,* 14 F.3d at 119.

### A. West's Appeal of the Unjust Enrichment Verdict

West's arguments for overturning the jury's unjust-enrichment verdict fall into two categories—those concerning West's liability and those concerning damages. After addressing both arguments, we then consider West's alternative motion for a new trial.

### 1. West's Liability for Unjust Enrichment

The trial judge charged the jury, without objection, as follows:

> In order to award East damages on the basis of unjust enrichment, you must find that East has demonstrated by a preponderance of the evidence that one, West was enriched, two, the enrichment was at East's expense, and three, the circumstances are such that equity and good conscience required West pay East for the reasonable value of what it received.

Transcript of 10/28/92 at 31–32. The trial judge then elaborated on these instructions as follows:

> Enrichment or benefit ... is not limited to pecuniary or monetary advantage. Whether equity and good conscience requires that West pay East for the value of any enrichment, if you find it was enriched, is not to be determined from a limited inquiry confined to an isolated transaction; it must be a realistic determination based upon a broad view of the human setting involved.... In this regard you can consider whether West overpaid East and Telefacs for their services, ... whether West intentionally misled East or induced East to stay on the GSA project intending

not to pay East for its services, and the parties investments of time and resources. *Id.* at 32; *see generally McGrath v. Hilding,* 41 N.Y.2d 625, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977); *Bradkin v. Leverton,* 26 N.Y.2d 192, 197, 309 N.Y.S.2d 192, 196, 257 N.E.2d 643, 645–46 (1970); *Miller v. Schloss,* 218 N.Y. 400, 113 N.E. 337 (1916); *Mayer v. Bishop,* 158 A.D.2d 878, 551 N.Y.S.2d 673 (3d Dept.1990).

West argues that East's unjust enrichment claims must fail as a matter of law because of the trial judge's finding, unchallenged on appeal, that the second-tier contract between Telefacs and East was not extinguished.

In support of its argument, West relies on the settled principle that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987); *Miller v. Schloss,* 218 N.Y. 400, 113 N.E. 337 (1916). This principle, West notes, has been relied on by New York's lower courts to dismiss quasi-contract claims by subcontractors against landowners with whom the subcontractors have not contracted. *See Mariacher Contracting Co. v. Kirst Constr., Inc.,* 187 A.D.2d 986, 987–88, 590 N.Y.S.2d 613, 615 (4th Dept. 1992); *Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 A.D.2d 758, 759, 583 N.Y.S.2d 497, 498 (2d Dept.1992); *Sybelle Carpet and Linoleum of Southampton, Inc. v. East End Collaborative, Inc.,* 167 A.D.2d 535, 536, 562 N.Y.S.2d 205, 206 (2d Dept. 1990); *Perma Pave Contracting Corp. v. Paerdegat Boat and Racquet Club. Inc.,* 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 59 (2d Dept.1989); *Schuler–Haas Elec. Corp. v. Wager Constr. Corp.,* 57 A.D.2d 707, 708, 395 N.Y.S.2d 272, 274 (4th Dept.1977); *see also Tibbetts Contracting Corp. v. O & E Contracting Co.,* 15 N.Y.2d 324, 258 N.Y.S.2d 400, 206 N.E.2d 340 (1965) (where real estate developer denied any contractual relationship with subcontractor throughout their course of dealing, and subcontractor acquiesced in that interpretation by billing the general contractor, no contract between the developer

and subcontractor could be implied in law or in fact).

The rationale behind this settled rule is that any services performed by the subcontractor were performed pursuant to its contract with the general contractor, and thus were done "for the benefit of the general contractor ..., not for the benefit of the owner." *Sybelle Carpet,* 167 A.D.2d at 536, 562 N.Y.S.2d at 206 (quoting *Schuler–Haas,* 57 A.D.2d at 708, 395 N.Y.S.2d at 274; *see also In re Loomis,* 273 N.Y. 76, 6 N.E.2d 103 (1937) (the fact that third parties were benefited by services of attorney on behalf of his client does not, in the absence of agreement by them, impose a liability on them to pay); *Restatement of Restitution* § 110 (1937) ("A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of the performance of the third person"). Since the landowner has bargained only with the general contractor, and the subcontractor has done likewise, the reasoning goes, the subcontractor should not be allowed to perform an end-run around the bargained-for contractual structure by seeking relief directly from the landowner, with whom he has not bargained.

■ West argues that this rule should dispose of the matter: Because the trial judge found that the second-tier contract between East and Telefacs had not been extinguished, and that East had not entered into an additional contract with West, East's rights were solely against Telefacs, and its unjust enrichment claims against West must fail.

As the trial judge recognized, however, the same New York cases that set out the principle above recognize that the principle is not absolute. New York courts have not dismissed subcontractor claims in quasi-contract against landowners automatically; rather, before dismissing such claims, they have inquired whether the landowner acted in such a way as to incur obligations to the subcontractor outside the contractual structure. *See, e.g., Metropolitan Elec.,* 183 A.D.2d at 759, 583 N.Y.S.2d at 498 (neither general contractor or landowners could be liable to subcontractor because "there is nothing in the record to establish, that [the general contractor] or the owners ..., by their actions, assumed an obligation to pay for the goods ordered by [the subcontractor]."); *Perma Pave,* 156 A.D.2d at 551, 549 N.Y.S.2d at 59 (where record contained no evidence that owner expressed willingness to pay subcontractor for its work, "[t]he owner's mere consent to and acceptance of improvements placed on his property by the subcontractor, *without more,* does not render it liable to the subcontractor") (emphasis added); *Contelmo's Sand & Gravel, Inc. v. J & J Milano, Inc.,* 96 A.D.2d 1090, 1091, 467 N.Y.S.2d 55, 57 (2d Dept.1983) (same).

■ The principle has been stated as follows:

[A] landowner is not liable to a subcontractor for work performed on the owner's property in furtherance of the subcontract *in the absence of an agreement to pay the general contractor's debt or circumstances giving rise to such an obligation.*

*Schuler–Haas,* 57 A.D.2d at 708, 395 N.Y.S.2d at 274 (citing *Woodruff v. Rochester & Pittsburgh R.R. Co.,* 108 N.Y. 39, 14 N.E. 832 (1888)); *followed in Westinghouse Elec. Supply Co. v. R.P. Brosseau & Co.,* 156 A.D.2d 851, 549 N.Y.S.2d 851 (3d Dept.1989); *see also Sybelle Carpet,* 167 A.D.2d at 536, 562 N.Y.S.2d at 206; *Custer Builders, Inc. v. Quaker Heritage, Inc.,* 41 A.D.2d 448, 451, 344 N.Y.S.2d 606 (3d Dept.1973); *Restatement of Restitution* § 110 cmt. a (benefits conferred on a third-party beneficiary through performance of a contract with another may not be recovered from the beneficiary *"unless made in anticipation of a promise which is not performed by the transferee"*) (emphasis added); 22 N.Y.Jur.2d *Contracts* § 547 (1982) ("*In the absence of an agreement to pay what another person is obligated to pay,* the mere fact of benefit from services rendered does not impose liability on a theory of quasi-contract") (emphasis added). This principle is equally applicable where, as here, the parties are a primary contractor and a second-tier subcontractor rather than a landowner and subcontractor.

West notes, correctly, that East has been unable to locate any cases in which a New

York court has actually granted a subcontractor judgment against a landowner pursuant to this principle. The Third Department, however, has applied the principle in a relatively recent case, even though the subcontractor did not prevail. *Westinghouse*, 156 A.D.2d 851, 549 N.Y.S.2d 851. In *Westinghouse*, a subcontractor shipped electrical supplies to a landowner pursuant to its contract with a general contractor. Shortly thereafter, the general contractor abandoned the job site and breached its contract with the subcontractor. In response, the landowner sought a temporary restraining order to prevent the subcontractor from removing the materials from the job site. In support of its motion, the landowner submitted an affidavit which stated, among other things, that "[p]ursuant to its contract with [the general contractor], [the landowner] is fully able and willing to make required payments" for the supplies. *Id.* at 852, 549 N.Y.S.2d at 852. The trial court awarded summary judgment to the subcontractor on the principle set out above, and the landowner appealed. Before finding factual ambiguities which required reversal, the Appellate Division affirmed the principle that we have set out above—whether the landowner was liable, it concluded, depended on the existence of "an agreement to pay the general contractor's debt or circumstances giving rise to such an obligation." *Id.* at 853, 549 N.Y.S.2d at 853.

West argues additionally that *Westinghouse* is distinguishable in a crucial detail: Before the landowner allegedly assented to pay the subcontractor, the prime contractor had abandoned the job and informed the subcontractor it would not be paid. Thus, West reasons, unlike in the case before us, the subcontract had been extinguished prior to the landowner's alleged assent to payment. The *Westinghouse* principle, West contends, should be applied, at most, to cases in which the subcontract is no longer valid.

■ We cannot find West's proposed distinction in the cases cited above. Those cases state a simple principle which applies whether or not the subcontract has been extinguished: A party, whether or not it is in a contractual relationship with another, may incur quasi-contractual obligations to a third

party with whom it has not contracted, by virtue of its direct representations to that party.

This conclusion is supported, not undermined, by West's citation to the principle of *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987)—that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." The principle of *Clark–Fitzpatrick*, while broad, is subject to exceptions. *See id.* at 388, 521 N.Y.S.2d at 656, 516 N.E.2d at 193 (recovery available in quasi-contract after rescission). Most relevant to the case before us, recovery in quasi-contract outside the existing contract may be had if a party has rendered additional services upon extra-contractual representations by the other party. *See, e.g., United States ex rel. Falco Constr. Corp. v. Summit General Contracting Corp.*, 760 F.Supp. 1004, 1011 (E.D.N.Y.1991) (holding that subcontractor may recover in quasi-contract from contractor for work performed outside the subcontract between the two because contractor requested the services and derived substantial benefit from them); *O'Keeffe v. Bry*, 456 F.Supp. 822 (S.D.N.Y.1978) (when *quantum meruit* recovery is sought by a salaried employee for "services rendered which fall outside the scope of duties of [the expressly agreed to] employment," entitlement to recovery turns on the question whether the "additional services" are "so distinct from the duties of [the] employment that it would be unreasonable for the employer to assume that they were rendered without expectation of further pay") (quoting *Robinson v. Munn*, 238 N.Y. 40, 43 143 N.E. 784, 785 (1924)).

■ Thus, we conclude that, under New York law, a subcontractor may recover from a landowner (and a sub-subcontractor from a general contractor), even when a separate contract exists between the subcontractor and general contractor, if the owner has agreed to pay the general contractor's debt or if the circumstances surrounding the parties' dealings can be found to have given rise to an obligation to pay.

In the case before us, West's promise to East that it would "get paid" was in the nature of a guaranty on Telefacs' debt to East. That the promise was found to be unenforceable for lack of specificity and lack of consideration (*see supra*, pages 1295–96) does not prevent East from recovering in quasi-contract for the amount by which West, through its actions, was unjustly enriched. When two parties have bargained with each other on the terms of an express contract but have failed to create an enforceable contract, whether because of failure to reach a meeting of the minds on terms or because of noncompliance with some formal requisite of contract law, such as consideration, recovery may nevertheless be available in quasi-contract for the reasonable value of a party's services to the other. *Moore v. New York*, 73 N.Y. 238 (1878); *Mayer v. Metropolitan Traction Co.*, 165 A.D. 497, 150 N.Y.S. 1026 (1914); 22 N.Y.Jur.2d *Contracts* § 543 (1982).

Given the conclusions above, we affirm the trial court's judgment. It was not unreasonable for the jury to conclude that East's completion of work on the New York project conferred a benefit upon West.[2] It was not unreasonable, additionally, for the jury to conclude that East's completion of the project conferred this benefit at the expense of East. East would certainly have saved itself considerable losses had it walked off the job in the face of Telefacs' apparent repudiation.

Finally, it was not unreasonable for the jury to conclude that East completed the job in reliance, at least in part, on West's representations that East would "get paid," and that, accordingly, equity and good conscience required West to pay East for the reasonable value of East's services. As the trial judge correctly concluded, evidence of such representations by West was extensive:

> There was testimony, which the jury could reasonably have credited, that: (1) West's supervisory employees in New York dealt with East employees on a daily basis and, responding to East's expressions of concern about payment, assured East that they would see that it was paid; (2) at the meetings in Denver between East and West, East made clear that if it was not assured that it would be paid directly by West for outstanding invoices and future work, it would have to pull its men off the job because it would be unable to make its payroll; (3) in Denver, West agreed to pay East directly, or at least work out a mechanism to assure that East was paid by split checks, and requested East not to take its men off the job; (4) West told East it was working for West now; (5) despite its purported surprise at learning of the unauthorized existence of East, and its disapproval of the hourly billing which had occurred, West met with East personnel, encouraged them to submit a subcontract package for approval that would allow at least a future contractual relationship, and urged East to keep its employees working on the GSA job; (6) West had an interest in inducing East to keep its workers on the job because it had deadlines to meet to fulfill its obligations to GSA.

Opinion at 47–48.

This testimony is certainly sufficient to support the conclusion that West, under enormous pressure to complete the GSA Project in New York on time, convinced East to stay on a job which it would otherwise have abandoned in response to Telefacs' apparent inability to perform. This evidence that East stayed on the job in reliance on West's representations would support the jury's verdict that equity and good conscience require West to pay East for the reasonable value of its services. *Cf., e.g., Mayer*, 158 A.D.2d 878, 551 N.Y.S.2d at 675. Also supporting that verdict was documentary evidence, in the form of West internal memoranda, of West's intention to "phase out" East after lining up replacement subcontractors. Crediting all

---

**2.** Although West argues that it was not enriched because it lost money "as a result of the challenged transaction," West's Brief at 40, a person may be liable in unjust enrichment even though the benefit received as a result of the unjust enrichment did not allow that person to turn a profit. Evidence was presented, for example, that East's performance allowed West to complete the GSA Project in New York in a timely fashion, and that such performance was essential to West's ability to receive future job offers from GSA.

this evidence, and taking into account a "broad view of the human setting involved," *McGrath v. Hilding*, 41 N.Y.2d 625, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977), we cannot conclude that the jury's verdict was unreasonable.

### 2. Damages for Unjust Enrichment

■■■■ East sought, and the jury awarded, damages in the amount of $439,953.25, plus interest, for unjust enrichment. That amount represented the total of East's unpaid invoices covering work performed in January and February 1987. The trial court reduced the award to $436,928.25, plus interest, on finding discrepancies in East's invoices. The trial judge instructed the jury:

> If you find that East is entitled to recover on its claim for unjust enrichment, East is entitled to receive the amount by which you find West was unjustly enriched.
>
> In determining the amount by which West was unjustly enriched, you may consider the reasonable value of the services East rendered to West. In doing so, you may consider the price of such service and materials set forth in any relevant contract, but you're not bound by those figures. It's for you to determine, based on the evidence, what the reasonable value is of the services and materials provided by East. You may find that such value was greater or less than the amounts billed by East. . . .
>
> In determining the amount of West's enrichment, you may also consider such factors as to [sic] West had to spend money to correct or complete East's work, whether West had already paid East more than East was entitled to for its services and whether the appropriate basis for any payment is task, or time and materials, about which you heard a great deal, or some combination thereof.

Transcript of 10/28/92 at 34–35; *and see Collins Tuttle & Co. v. Leucadia, Inc.*, 153 A.D.2d 526, 544 N.Y.S.2d 604 (1st Dept.1989).

West contends that the trial court should have granted judgment as a matter of law on East's unjust enrichment claim because East "offered no evidence from which a reasonable jury could determine the value of the services East performed." West's Brief at 29. We disagree.

East offered as evidence invoices which contained a summary of the hours worked by each employee and their hourly rate of pay, and supplemented the invoices with time sheets. West contends that the invoices were riddled with inaccuracies and that, additionally, East offered inadequate evidence of how its invoices were prepared. *See Lewis v. Barsuk*, 55 A.D.2d 817, 818, 389 N.Y.S.2d 952, 953 (4th Dept.1976) (reversing judgment in contract case where plaintiff offered suppliers' invoices without proving actual payments); *Answering Serv., Inc. v. Egan*, 785 F.2d 1084, 1088–90 (D.C.Cir.1986) (attorneys' billing statement not presumptively accurate or reflective of the true value of services provided).

East's proof, however, was not limited to the invoices and time sheets. There was testimony that West made no complaint about the quality of East's work and that East's hourly rates were reasonable in relation to those of other subcontractors in New York. East also presented documentary evidence from three federal agencies that East's work was competent. Additionally, and most significantly, the accuracy of East's time records was corroborated by a West supervisor, Mitch Sherman, who had first-hand knowledge of East's work. In an internal West memorandum, Sherman is reported as concluding that Telefacs—that is, through East—"did expend the hours and men to support their hourly billing." *See* Memorandum of April 23, 1987 from Mike Hutson to Norm Curtwright, at 2, 6. As the trial court correctly concluded, the weight to be accorded East's documents and its witnesses' testimony was within the province of the jury. *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 335 (2d Cir.1993); *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1039–40 (2d Cir.1992). Viewing the evidence in the light most favorable to East, we cannot conclude that the jury's damage award was unreasonable.

### 3. West's Motion for a New Trial

■■■■ West contends, alternatively, that the trial judge abused his discretion in deny-

ing West's motion for a new trial on East's unjust enrichment claims. Whereas we review an order denying or granting a motion for judgment as a matter of law *de novo*, *Kirschner v. Office of Comptroller*, 973 F.2d 88, 92 (2d Cir.1992), we will afford considerable deference to a trial judge's decision whether to grant a new trial. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), *cert. denied*, — U.S. —, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). The decision whether to grant a new trial on the ground that the verdict was against the weight of the evidence "is committed to the sound discretion of the district court." *Id.* In exercising that discretion, a trial court may order a new trial when it is convinced "that the jury has reached a 'seriously erroneous result' or that the verdict is ... against the weight of the evidence." *Mallis v. Barkers Trust Co.*, 717 F.2d 683, 691 (2nd Cir.1983); *see also Purnell v. Lord*, 952 F.2d 679, 686 (2d Cir.1992).

 There is serious doubt whether a district court's order denying a motion for a new trial because the verdict is against the weight of the evidence is even reviewable in this circuit. *See Piesco v. Koch*, 12 F.3d 332, 344 (2d Cir.1993); *Fugazy*, 983 F.2d at 363 (discussing authorities). Even if the district court's decision is reviewable, however, we will not reverse such a denial unless it constituted an abuse of discretion, *Fugazy*, 983 F.2d at 363, or unless the district court applied the wrong legal standard in denying the motion, *Piesco*, 12 F.3d at 344.

In urging a new trial, West essentially repeats its argument that it received no benefit from East because East was obligated to perform under its contract with Telefacs. Assuming *arguendo* that the decision of the trial court is reviewable, we reject West's argument for a new trial for the same reasons we deny West's motion for judgment as a matter of law. As we set out above, ample evidence was presented at trial that East continued work on the GSA Project in January and February 1987 in response, at least in part, to West's representations that East would "get paid." Ample evidence was presented as well that West benefitted from East's decision to complete performance and that East was damaged.

Similarly, for the reasons set out above, we reject West's argument that the jury's award of damages was seriously erroneous. We therefore affirm the order of the trial judge denying West's alternative motion for a new trial.

### B. East's Cross–Appeal

 East contends on cross-appeal that the district court erred in granting summary judgment on its fraud and punitive damages claims. We review a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the party which opposed the motion. *Prunier v. City of Watertown*, 936 F.2d 677, 679 (2d Cir.1991). Our review is confined to an examination of the materials before the trial court at the time the ruling was made, and neither the evidence offered subsequently at trial nor the verdict is relevant. *United States v. Hardage*, 982 F.2d 1436, 1444 (10th Cir.1992); *Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir.1985), *cert. denied sub nom. Saugus v. Voutour*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

The district court granted summary judgment on the ground that East, in support of its fraud claim, had adduced no evidence beyond those facts supporting its claim for breach of contract—*i.e.*, that West failed to pay East according to the terms of the alleged oral agreement between the two. To withstand the summary judgment motion, the court concluded, East would have to present evidence of action on West's part going beyond nonperformance of contractual duties, as well as evidence of damages stemming from an injury other than the breach of contract. The court concluded that East failed to present such evidence. We concur.

East relies on *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958), in which the New York Court of Appeals held that an action based on fraudulent misrepresentation may be maintained against one who represents falsely that he intends to perform a contract, while actually intending not to perform. *Accord Stewart v. Jackson & Nash*, 976 F.2d 86 (2d Cir.1992); *Deerfield Commu-*

*nications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986); *Sabo v. Delman,* 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906, 908 (1957) ("While '[m]ere promissory statements as to what will be done in the future are not actionable', ... if a promise was actually made with a preconceived and undisclosed intention of not performing it," an action for fraudulent inducement may lie) (citations omitted).

West responds by citing a line of cases in which the New York Appellate Division, First Department, has stated that fraud claims of this sort "will be dismissed when 'the only fraud charged relates to a breach of contract.'" *Vista Co. v. Columbia Pictures Inds.,* 725 F.Supp. 1286, 1294 (S.D.N.Y.1989) (citing *Trusthouse Forte v. Garden City Hotel, Inc.,* 106 A.D.2d 271, 483 N.Y.S.2d 216, 218 (1st Dept.1984)) (other citations omitted); *see also Mastropieri v. Solmar Construction Co.,* 159 A.D.2d 698, 700, 553 N.Y.S.2d 187, 189 (1st Dept.1990) (fraud claim must be dismissed where plaintiff fails to "assert the breach of a duty extraneous to or distinct from the contract"); *Metropolitan Transp. Auth. v. Triumph Advertising Prods., Inc.,* 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dept.1986) ("cause of action for fraud does not arise when the only alleged fraud relates to a breach of contract").

In an attempt to establish that the New York Court of Appeals has endorsed this line of cases, West cites a Court of Appeals case which concerned a claim for negligence, not fraud, arising out of a contract. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656–57, 516 N.E.2d 190, 193–94 (1987) ("It is a well-established principle that *a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.* This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract") (emphasis added & citations omitted).

We need not, however, resolve whether East's evidence supports a conclusion that West violated a "legal duty indepen-dent of the contract itself," or indeed whether such evidence is required to uphold East's fraud claim. *See Kenevan v. Empire Blue Cross and Blue Shield,* 791 F.Supp. 75, 80 (S.D.N.Y.1992) (concluding that New York case law is split on this issue). We conclude that summary judgment was properly granted because nothing in the affidavits and documents submitted by East in opposition to West's summary judgment motion supports the conclusion that West acted with fraudulent intent.

East's exhibits consist almost entirely of West internal memoranda drafted in the wake of the January 1987 meeting between West and East representatives in Denver. They record statements made by West representatives after West's alleged promise of payment at the Denver meeting, on the subject of future accommodations with Telefacs and East. While these statements are certainly relevant to the issue of West's performance or nonperformance of its contractual and quasi-contractual obligations, East has identified nothing in them from which a reasonable jury could conclude that West acted with fraudulent intent. These documents, at most, express West's intention to "phase out" Telefacs and East after lining up replacement subcontractors. An intention to "phase out" East does not, however, constitute the fraud which East alleges in its complaint— *i.e.,* that West fraudulently induced East to continue working through false promises that it would "get paid." *See* Amended Complaint ¶ 9.

No reasonable jury could conclude from these documents that West extended promises of payment to East with a "preconceived and undisclosed intention of not performing," *Sabo,* 3 N.Y.2d at 160, 164 N.Y.S.2d at 716, 143 N.E.2d at 908. Accordingly, we conclude that East failed to sustain its burden in opposition to West's summary judgment motion, and we affirm the grant of summary judgment.

## III. Conclusion

For the foregoing reasons, the orders of Judge Duffy and Magistrate Judge Katz are

affirmed, and the Amended Judgment is affirmed.