IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————

No. 09-12129

————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 10, 2012
JOHN LEY
CLERK

D. C. Docket No. 08-20112-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

ANDREA G. HOFFMAN,
SEAN PAUL CRONIN,

Interested-Parties-Appellants,

versus

ALI SHAYGAN,

Defendant-Appellee.

————

Appeal from the United States District Court
for the Southern District of Florida

————

**ON PETITION FOR REHEARING EN BANC**

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR, and MARTIN, Circuit Judges.[*]

BY THE COURT:

The court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure), the Suggestion of Rehearing En Banc and the Petition for Rehearing are **DENIED.**

/s/ JOEL F. DUBINA
CHIEF JUDGE

---

[*]Judge Adalberto Jordan did not participate in the en banc poll.

2

PRYOR, Circuit Judge, respecting the denial of rehearing en banc:

I reluctantly write this opinion respecting the denial of rehearing en banc to respond to the dissenting opinion that follows. Judge Henry Friendly once observed that the practice of publishing a dissent about a decision in which the dissenter "did not participate" and "the Court has declined to review . . . en banc" is "of dubious policy." United States v. New York, New Haven & Hartford R.R. Co., 276 F.2d 525, 553 (2d Cir. 1960) (Friendly, J., concurring in denial of reh'g en banc, joined by Lumbard, C.J.). And Judge Raymond Randolph, who clerked for Judge Friendly, perhaps put it best: "[D]enials of rehearing en banc are best followed by silence. They should not serve as the occasion for an exchange of advisory opinions, overtures to the Supreme Court, or press releases." Indep. Ins. Agents of Am. v. Clarke, 965 F.2d 1077, 1080 (D.C. Cir. 1992) (Randolph, J.). But, alas, "dissents from denial of rehearing en banc are now routine." Indraneel Sur, How Far Do Voices Carry: Dissents from Denial of Rehearing En Banc, 2006 Wis. L. Rev. 1315, 1317; see also Sahyers v. Prugh, Holliday & Karatinos, P.L., 603 F.3d 888, 889 (11th Cir. 2010) (Edmondson, J., concurring in denial of reh'g en banc) (questioning "the fashion" of filing "dissents regularly when en banc rehearing is denied").

3

The original panel opinion speaks for itself, but I write, as the author of that opinion, to set the record straight about a matter that the dissent misunderstands. The Hyde Amendment allows for the extraordinary remedy of invading the public fisc to pay an acquitted criminal defendant's attorney's fees, and this rare waiver of sovereign immunity applies only when a court determines that the entire "position of the United States was vexatious, frivolous, or in bad faith." Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). The "position" of the United States is expressed as a singular term for obvious reasons. Congress expected a court to assess the overall prosecution of a defendant and not base an award of fees only on discrete actions that took place during that prosecution. Traditional sanctions exist for discrete wrongs like discovery violations that occur during an otherwise reasonable prosecution, but an award of attorney's fees under the Hyde Amendment is not one of those sanctions. The Hyde Amendment is concerned with wrongful prosecutions, not wrongs that occur during objectively reasonable prosecutions. The district court erred in when it held otherwise, and the dissent fails to grasp this distinction.

## I. BACKGROUND

4

The panel opinion provides a thorough discussion of the facts underlying this appeal, United States v. Shaygan, 652 F.3d 1297, 1302–10 (11th Cir. 2011), but some of those facts, which are unmentioned in the dissent, merit special review. Most notably, the United States began its investigation and prosecution of Ali Shaygan with more than good cause: it all started with a suspicious death.

On June 9, 2007, James Brendan Downey died from an overdose of various drugs including methadone and cocaine. An autopsy revealed that the level of methadone in Downey's blood was alone enough to kill him. Two days before Downey died, Dr. Shaygan had prescribed methadone to Downey.

Downey's girlfriend, Crystal Bartenfelder, testified that she had visited Shaygan's office with Downey on June 7, 2007, and that Shaygan had not conducted any kind of physical examination of Downey. She testified that, during the same visit, Downey asked Shaygan for more oxycodone than he had previously been prescribed. She testified that Shaygan expressed concern that the increased amount of oxycodone would look suspicious, so Shaygan suggested methadone, which Downey accepted. Bartenfelder was with Downey the night he died, and she testified that he died in his sleep after taking the methadone.

After Downey's death, the Drug Enforcement Administration conducted an undercover investigation of Shaygan. Two local police officers posed as

5

prospective patients to determine how easily they could obtain prescriptions of controlled substances from Shaygan. They recorded their conversations and obtained prescriptions for several controlled substances during their first visits to Shaygan's office. The officers presented no medical records and were given minimal physical examinations during these visits.

On February 8, 2008, the government filed an indictment that charged in 23 counts that Shaygan had distributed and dispensed controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of federal law. See 21 U.S.C. § 841(a)(1). When the indictment was filed, the government had not yet identified any of Shaygan's other patients. On February 11, 2008, Administration agents arrested Shaygan and obtained his consent to search his office. The agents seized patient files and Shaygan's day planner. The agents used information from the day planner to identify additional patients of Shaygan, and evidence regarding these patients formed the basis for additional counts contained in a superseding indictment filed on September 26, 2008.

Before trial began, Sean Cronin, one of the two prosecutors on the case, suspected that Shaygan's defense team might be tampering with potential witnesses. He and his fellow prosecutor, Andrea Hoffman, spoke with their

supervisor at the United States Attorney's Office, Karen Gilbert, who permitted Drug Enforcement Agent Christopher Wells to ask two potential government witnesses to record calls with the defense team. Gilbert instructed Cronin that she would be responsible for the collateral investigation and that Cronin and Hoffman should take no part in the investigation. Gilbert also instructed Agent Wells not to disclose information about the collateral investigation to Cronin or Hoffman. Agent Wells spoke with the two witnesses, who agreed to record conversations with the defense team. One of the witnesses, Carlos Vento, later signed a confidential informant agreement. Agents filed DEA-6 reports that documented that Vento and the other witness, Trinity Clendening, had recorded conversations with the defense team and that Vento had signed a confidential informant agreement.

At a status conference the week before trial, the district court ordered the government to turn over any DEA-6 reports so that the court could read them before trial to determine if they contained any exculpatory material that should be given to the defense under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Two days later, Cronin filed DEA-6 reports for several witnesses. Cronin had asked Agent Wells for all DEA-6 reports, but Cronin did not ask specifically for

those generated in the collateral investigation. The government did not produce the DEA-6 reports related to the collateral investigation.

At trial, the government presented a wealth of evidence to suggest that Shaygan had distributed and dispensed controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of federal law. See Shaygan, 652 F.3d at 1305–06. Downey's girlfriend testified that Shaygan, without conducting any physical examination, prescribed Downey the methadone that killed Downey two days later. Id. at 1305. Three of Shaygan's former associates testified that Shaygan routinely wrote them prescriptions for controlled substances without any legitimate medical purpose. Id. The two undercover police officers testified. The government played tape recordings of their conversations with Shaygan for the jury, and the officers explained how Shaygan had provided them prescriptions for controlled substances. Id. Four of Shaygan's former patients gave testimony consistent with the prosecution's theory. Id. at 1305–06. Two other patients gave testimony that did not support the prosecution's theory, but the patients' earlier statements and evidence from their medical files did. Id. at 1306.

During the cross-examination of Clendening, Clendening mentioned a recording he had of a conversation with one of Shaygan's attorneys. The next day,

8

the government explained to the court the recordings and the collateral investigation. The district court allowed the defense to call Vento and Clendening again for cross-examination. The court instructed the jury that the defense did nothing wrong and that "the United States had acted improperly in not turning over the necessary discovery materials and also by allowing recordings to occur in the first place." Id. at 1307–08.

Shaygan was represented by an elite defense attorney, and Shaygan's superb counsel took advantage of the opportunity to focus the attention of the jury on the alleged misconduct by the government in the collateral investigation. During the new cross-examinations of Vento and Clendening, Shaygan's counsel accused them of not telling the whole truth to the jury because they had not revealed that they had been asked to record conversations with the defense team. In closing argument, Shaygan's counsel compared the alleged misconduct by the government to the Salem witch trials. Shaygan's counsel reminded the jury that the district court had instructed them that the "United States [had] acted improperly," and argued that the jurors had been misled by the government. Shaygan's counsel argued that innocent women had been convicted and hung in the Salem witch trials "because there were no jurors," and he urged the jury to say "no" and to

9

"make sure the Salem, Massachusetts[,] witch trials never happen again." Id. at 1308.

The jury returned a verdict of not guilty on all counts. Immediately after the jury was dismissed, the district court ordered the government to appear on the following Monday. The court stated that it would "hear alternative requests for sanctions," including whether a sanction in the form of attorney's fees and costs should be awarded under the Hyde Amendment. Id. The court at no time stated that it was considering sanctions against the individual prosecutors.

The district court granted Shaygan's motion under the Hyde Amendment and ordered the United States to reimburse Shaygan in the amount of $601,795.88 for attorney's fees and costs from the date of the superseding indictment. The court held that the superseding indictment, though supported by newly discovered evidence, was filed in bad faith because it came after a heated discussion between Cronin and Shaygan's counsel. The court also highlighted the discovery violations related to the collateral investigation and held that "discovery violations in the course of a prosecution can form a basis for the award of attorney's fees under the Hyde Amendment." Id. at 1310. The district court virtually ignored the substantial evidence that supported the charges against Shaygan.

Without providing notice to the prosecutors that they were facing individual sanctions and without even hearing from Hoffman, the district court also entered a public reprimand "against the United States Attorney's Office and specifically against AUSA Karen Gilbert, Sean Cronin, and Andrea Hoffman." Id. The district court ordered the United States Attorney's Office to provide "the contact information for the relevant disciplinary body of the Bar(s) of which AUSA Cronin and Hoffman are members," and stated that it would request that disciplinary action be taken against Cronin and Hoffman. Id. The prosecutors were never given an opportunity to contest the allegations the court made against them.

Although the dissent mentions the "vital and laudatory role," Dissenting Op. at 21, of prosecutors and opines that the district judge "performed his assigned role with great care," id. at 23, the dissent neglects to mention the grievous wrong that the district court committed against the trial prosecutors, Sean Cronin and Andrea Hoffman, in this case. By ignoring this matter, the dissent understandably refrains from defending the inquiry by the district court that led to the public reprimand of these prosecutors without affording them the two rudiments of the fundamental civil right of due process: notice and an opportunity to be heard. About that error, the panel opinion was unanimous. See Shaygan, 652 F.3d at

1318–19, 1326. We vacated the sanctions by the district court and refused to affirm any finding that the trial prosecutors had engaged in any misconduct. Id.

The dissent does not contest our ruling, but instead ignores it altogether. The dissent states that "this Court's opinion in Shaygan does not set aside the findings of fact that undergirded Judge Gold's Hyde Amendment analysis. Indeed, the opinion assumes that the prosecutors did and said everything that Judge Gold found to be true. Neither does it point to error in Judge Gold's findings of fact that the prosecutors acted in violation of their ethical obligations as representatives of our government." Dissenting Op. at 33. The panel opinion did not need to decide whether the findings of alleged misconduct as they related to the award of fees under the Hyde Amendment were clearly erroneous, as the government argued, because the alleged misconduct, even if true, could not constitute "the position of the United States." But the findings of misconduct, as they were used to support the reprimands of the prosecutors, were vacated by the unanimous panel as "unreliable because [they] w[ere] developed, after all, without affording either [prosecutor] due process." Shaygan, 652 F.3d at 1319. The panel refused as follows to endorse any findings of misconduct: "It is not apparent to us that either attorney necessarily violated any ethical rule or any constitutional or statutory standard." Id. These public servants deserve better.

12

## II. DISCUSSION

When it awarded Shaygan fees under the Hyde Amendment, the district court erred in two ways. First, as the panel opinion explains more thoroughly, the superseding indictment was not brought in "bad faith" because there was an objectively reasonable basis for bringing it. See Shaygan, 652 F.3d at 1312–15. That is, the government uncovered new evidence of additional unlawful activity when agents discovered Shaygan's day planner. The day planner led the agents to new patients and witnesses, and based on information from these patients, the government filed the superseding indictment. Shaygan never denied that the superseding indictment was supported by new and sufficient evidence. The prosecutors were doing their job, and when "[w]hen public officials do their jobs, it is a good thing." Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996). Second, the district court erred when it held that discovery violations alone can support an award of attorney's fees under the Hyde Amendment. The term "position of the United States" refers broadly to the overall litigating position of the United States, not to isolated instances of misconduct in an otherwise justifiable prosecution. Because the prosecution of Shaygan was objectively reasonable, the district court did not have discretion to award attorney's fees under the Hyde Amendment.

13

The panel opinion held that the Hyde Amendment is reserved for a specific kind of wrong. The Amendment applies when the government brings a prosecution that is objectively wrong, not when the prosecutor commits wrongs during a reasonable prosecution. Although the dissent expresses fear that the panel opinion will leave courts without the power to check prosecutorial misconduct, checks on prosecutorial misconduct existed long before the Hyde Amendment and remain in force. For example, as a sanction of prosecutors for discovery violations, a district court can prohibit the government from introducing the undisclosed evidence or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(C)–(D). A court also can publically reprimand prosecutors for misconduct, though it must afford them due process, which the district court failed to do here. But a court can grant the extraordinary remedy of an award of attorney's fees only when it establishes that a wrongful prosecution has occurred. No comparable remedy existed before the enactment of the Hyde Amendment. The dissent suggests that "Congress sought to respond to patterns of prosecutorial misconduct" when it used the phrase "the position of the United States," Dissenting Op. at 34, as if Congress intended the Hyde Amendment to supplant extant remedies for prosecutorial misconduct. But that interpretation makes no sense.

14

Our interpretation of the Hyde Amendment is consistent with the decision of the Sixth Circuit in United States v. Heavrin, 330 F.3d 723 (6th Cir. 2003). In that case, the district court had awarded a defendant attorney's fees and costs under the Hyde Amendment on the ground that some of the charges against him were frivolous, but the Sixth Circuit reversed. The Sixth Circuit ruled that the district court had erred when it awarded attorney's fees and costs without "assess[ing] the case as an inclusive whole." Id. at 731. The Sixth Circuit reasoned that "[a] count-by-count analysis" was inconsistent with the Hyde Amendment because its plain language refers to the "position" of the United States in the singular. Id. at 730. It concluded that, "[w]hen assessing whether the position of the United States was vexatious, frivolous, or in bad faith, the district court should . . . make only one finding, which should be based on the case as an inclusive whole." Id. (internal quotation marks omitted).

The dissent misinterprets the panel opinion and states that it "collapses the Hyde Amendment inquiry into only a single question: were the charges against the defendant baseless?" Dissenting Op. at 33. But the panel opinion holds that the appropriate inquiry under the Hyde Amendment is as follows: was it reasonable to prosecute this case? Plainly these are different questions.

It is not difficult to imagine a prosecution that begins with objectively reasonable charges and later becomes unreasonable to prosecute. For example, the government could bring a case that was objectively reasonable at the outset and later discover evidence that proved that a defendant was not guilty. If the government continued to prosecute the case, the litigating position of the United States would be in bad faith. Nothing in the panel opinion contradicts this interpretation.

The dissent states that the Hyde Amendment requires a court to consider "a case as an inclusive whole," Dissenting Op. at 35, and "not fail to see the forest for the trees," id. at 36, but the dissent then rests its case on alleged discovery violations related to two witnesses' roles in a collateral investigation. The dissent fails to explain how these alleged wrongs represent the entire "position of the United States." The dissent ignores the wealth of evidence that supported both the initial and superseding indictments of Shaygan, including documentary evidence and testimony from former employees, former patients, and two undercover police officers. The dissent cautions against taking a narrow view of the case, but then makes that very mistake.

The dissent's argument is based heavily on a snippet of legislative history of the Hyde Amendment, but that snippet provides a perfect example of why, "when

16

we consult legislative history, we [must] do so with due regard for its well-known limitations and dangers." Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008). The dissent notes that, when Representative Henry Hyde introduced the first version of the Hyde Amendment, he spoke of instances when prosecutors "keep information from [the defendant] that the law says they must disclose," "hide information," and "suborn perjury." Dissenting Op. at 34 (quoting 143 Cong. Rec. H7786-04, at H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Hyde)). The dissent reasons that "it seems Congress clearly understood that the presence of probable cause does not, and should not, excuse patterns of gross prosecutorial misconduct." Dissenting Op. at 34–35.

The dissent's argument about this legislative history is unavailing for at least two reasons. First, Congressman Hyde's statements were made in support of the first version of the Amendment, which was patterned after the Equal Access to Justice Act. See 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde). In that earlier version, any acquitted defendant would have been able to receive attorney's fees unless the government could establish that its position was "substantially justified." United States v. Gilbert, 198 F.3d 1293, 1300 (11th Cir. 1999) (quoting 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde)). "[I]n response to concern that the initial version of the Hyde

17

Amendment swept too broadly, the scope of the provision was curtailed significantly" by replacing the old standard with the current standard. Id. at 1302. Thus, Congressman Hyde's statements were made in support of a more lenient standard that Congress rejected. His statements tell us little about the "daunting obstacle" that Congress ultimately adopted. Id. Second, even if Congressman Hyde's statements were relevant, when taken as a whole, they support the view that the Amendment applies only to wrongful prosecutions, not isolated wrongs during reasonable prosecutions. Congressman Hyde warned against the circumstances where the government "charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong." 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde). The government might engage in various types of prosecutorial misconduct, "[b]ut they lose the litigation, the criminal suit, and they cannot prove substantial justification. In that circumstance . . . you should be entitled to your attorney's fees reimbursed and the costs of litigation . . . . That, my friends, is justice." Id. (emphasis added). Congressman Hyde's statements referred to instances where an entire prosecution is wrong, not instances where a prosecutor commits only a discovery violation or only dislikes a defendant.

The dissent also argues that "the First Circuit has recognized that, under the Hyde Amendment, an award may properly be based on 'an array of government conduct both before the indictment and during litigation,'" Dissenting Op. at 36 (quoting United States v. Knott, 256 F.3d 20, 31 (1st Cir. 2001)), but the dissent's assertion is misleading to the extent that it suggests that Knott allows an award under the Hyde Amendment whenever a defendant's right to discovery is violated. In the same paragraph quoted by the dissent, the First Circuit stated that it would "consider the conduct of the investigation in order to provide a context in which to assess whether a prosecution was 'vexatious.'" Knott, 256 F.3d at 31 (emphasis added). Again, the proper inquiry encompasses the whole prosecution—the forest, not the trees. The First Circuit concluded in Knott that because "[t]he government had ample reason to investigate and pursue charges against the defendants . . . an award of attorneys' fees under the Hyde Amendment [wa]s clearly not warranted." Id. at 34.

If, as the dissent argues, the Hyde Amendment was meant "to respond to patterns of prosecutorial misconduct," Dissenting Op. at 34, then Congress's requirement that a defendant be acquitted before an award may be even considered would be unnecessary. If the alleged discovery violations in Shaygan's prosecution were the kinds of wrongs Congress sought to address with the Hyde

19

Amendment, then Shaygan should be entitled to attorney's fees whether the jury found him guilty or not. An award of fees, after all, would be a powerful check on prosecutorial power. But Congress did not open the federal treasury to convicted felons.

The extraordinary remedy provided by the Hyde Amendment applies only when a prosecution, assessed as an inclusive whole, is wrong. The prosecution of Shaygan, triggered by the death of his patient and supported by substantial evidence, was not wrong. The Hyde Amendment does not entitle Shaygan to an award of fees of $601,795.88.

MARTIN, Circuit Judge, dissenting from the denial of rehearing en banc, in which BARKETT, Circuit Judge, joins:

Prosecutors perform a vital and laudatory role for our society. To help them carry out this role, we give them enormous power. This, even to such an extent that they have authority to decide whether our government will seek to take the life of a given criminal defendant. Our federal prosecutors are taught—and often reminded—that the "interest" of the United States "in a criminal prosecution is not that it shall win a case, but that justice shall be done." Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999) (quotation marks omitted). My observation is that prosecutors almost always do their job so as to bring honor to the remarkable criminal justice system that is ours. At the same time, our system of government is one of checks and balances, and no public official was intended to have power without end.

In 1997, Congress enacted just such a check on prosecutors in a statute commonly referred to as the Hyde Amendment. The legislation was widely understood to be Congress's response to the prosecution of former Congressman

Joseph McDade, who had served seventeen terms in Congress.  After a lengthy federal investigation and trial, a jury acquitted Mr. McDade.  During the development of that legislation, Congressman Henry Hyde, then Chairman of the House Judiciary Committee, referred to "someone we all know who went through hell, if I may use the term, for many years of being accused and finally prevailed at enormous expense, one he will never get out from under."  143 Cong. Rec. H7786-04, at H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Henry Hyde, Chairman, H. Comm. on Judiciary).  In that same discussion, Congressman Hyde described the concerns motivating the law which bears his name:

> What if Uncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong.  They are not just wrong, they are willfully wrong, they are frivolously wrong.  They keep information from you that the law says they must disclose.  They hide information. They do not disclose exculpatory information to which you are entitled.  They suborn perjury.

Id.  As it was ultimately passed, the Hyde Amendment permits federal courts to award reasonable attorneys fees to criminal defendants who are acquitted if "the position of the United States was vexatious, frivolous, or in bad faith."  Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).  Thus, we in the judicial branch were given our own

22

role to play in this system of checks and balances to protect against prosecutorial misconduct.

The trial judge in this case performed his assigned role with great care. U.S. District Judge Alan S. Gold's comprehensive fifty-page Order awarding Hyde Amendment attorneys fees to Dr. Ali Shaygan was "crowded with thorough findings of fact" detailing government misconduct that took place in his prosecution. United States v. Shaygan, 652 F.3d 1297, 1321 (11th Cir. 2011) (Edmondson, J., concurring in part and dissenting in part). Judge Gold entered his exhaustive Order after (1) shepherding the case through the more than fifteen months between the time when Dr. Shaygan was indicted, until this appeal was filed; (2) presiding over the four-week jury trial of Dr. Shaygan which culminated in the jury acquitting the doctor of all 141 counts in the indictment, after a mere three hours of deliberation, see United States v. Shaygan, 661 F. Supp. 2d 1289, 1291 (S.D. Fla. 2009), and (3) presiding over an extensive two-day evidentiary hearing held after the acquittal, on Dr. Shaygan's motion seeking relief under the Hyde Amendment, see id.

This Court's opinion sets aside none of Judge Gold's findings of misconduct by the prosecutors, but relieves the government of all Hyde Amendment sanctions, holding that the attorneys fees were not permitted as a

23

matter of law. Specifically, the opinion holds that so long as a prosecutor has an objective basis for charging a defendant, even patterns of serious prosecutorial misconduct are immune from sanction under the Hyde Amendment. See Shaygan, 652 F.3d at 1317.[1] To get to this result, the opinion rewrites the statute by limiting the term "the position of the United States" to mean only the basis for bringing charges. The statute will now be enforced in our Circuit in a way that places precisely the type of prosecutorial misconduct Congressman Hyde highlighted as motivating passage of the Hyde Amendment beyond its scope. This Court's opinion also strips our federal trial judges of a rarely needed, but critical tool for deterring and punishing prosecutorial misconduct. And the prosecutorial misconduct that happened in Dr. Shaygan's case deserved punishment.[2]

## I.

Dr. Shaygan was a medical doctor practicing in Miami. Prosecutors from the U.S. Attorney's Office in the Southern District of Florida sought, and the Grand Jury returned, a twenty-three count indictment charging Dr. Shaygan with

---

[1] The opinion does devise a single exception to this rule. Where a prosecutor uses a constitutionally impermissible factor—such as race or religion—in deciding to bring charges, the opinion permits Hyde Amendment sanctions even if the charges are supported by probable cause. See Shaygan, 652 F.3d at 1312–13. I find the basis for this lone exception nowhere in either the text of the Hyde Amendment or the statute's legislative history.

[2] I do not contest the panel's decision to vacate the public reprimands against the prosecutors on due process grounds. What I object to is the majority's Hyde Amendment analysis.

distributing controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1). Shaygan, 661 F. Supp. 2d at 1293. The indictment also charged that Dr. Shaygan's improper prescribing practices resulted in the death of one of his patients. Id. Judge Gold found that the bringing of the original indictment was "not frivolous or commenced in bad faith." Id. at 1321. However, the prosecution of Dr. Shaygan ran into problems, and the prosecutors responded with tough tactics that deteriorated into disobeying Court Orders, hiding evidence, and shirking the longstanding obligations imposed upon federal prosecutors by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), and the Jencks Act, 18 U.S.C. § 3500.

Early on in his prosecution, Dr. Shaygan refused to withdraw his ultimately successful motion to suppress certain statements taken from him by investigators in violation of his Miranda rights. The prosecutors responded by taking their case against Dr. Shaygan back to the Grand Jury, to get a Superseding Indictment which added, by my count, 118 counts to the original charges. Shaygan, 661 F. Supp. 2d at 1298. This is the path by which the jury was ultimately presented with a 141-count indictment against Dr. Shaygan. As I have said, the jury quickly acquitted him of every count.

25

Judge Gold's Order tells of how it came to pass that prosecutors enlisted two of their most important witnesses, Carlos Vento and Trinity Clendening (former patients of Dr. Shaygan), to secretly record conversations with Dr. Shaygan's lawyers and their investigator. The lead prosecutor promoted these surreptitious recordings based on a report he got from his own investigator, an agent of the Drug Enforcement Agency (DEA). The DEA agent reported that a third prosecution witness, another patient named Courtney Tucker, was "going south" and "showing signs of reluctance" about testifying against Dr. Shaygan. Id. at 1301. The DEA agent advised that Ms. Tucker was wary of cooperating with the government in Dr. Shaygan's case, because she feared the government would portray her as a drug addict during her testimony at Dr. Shaygan's trial and might even prosecute her in the future. See id. at 1300. Based on this report, the lead prosecutor concluded that Dr. Shaygan's lawyers were behind Ms. Tucker's reluctance to testify and were engaging in "witness tampering." See id. at 1302. He instituted the secret recordings to investigate. Id.[3]

_____

[3] This was not the first allegation of witness tampering made by these very prosecutors related to Dr. Shaygan's defense team. These same two prosecutors earlier brought a case against Evelio Cervantes Conde, which resulted in Mr. Conde being acquitted. See United States v. Conde, No. 07-cr-20973 (S.D. Fla. July 18, 2008) (entering judgment of acquittal). Mr. Conde was represented by Mark Seitles, who later became one of Dr. Shaygan's lawyers. After the Conde acquittal, the two prosecutors filed a criminal complaint against Mr. Conde, charging him with witness tampering. Shaygan, 661 F. Supp. 2d at 1293. Mr. Seitles contested the charge with supervisors in the U.S. Attorney's Office, and the witness tampering case against Mr. Conde was dropped without an

Among the problems with this premise for the surreptitious recording of the defense team is that the defense team never did say these things to Ms. Tucker, and neither did Ms. Tucker ever tell the DEA agent that they had. See id. at 1299. On this point, Judge Gold heard testimony from all involved, and made a finding that Ms. Tucker did not tell the DEA agent that anyone from the defense team had ever warned her that she would be subject to federal prosecution or that the government would attempt to portray her as a drug addict. Id. Judge Gold credited Ms. Tucker's testimony that the defense team never tried to intimidate her. Id. Indeed, the evidence indicated that it was the government that fabricated Ms. Tucker's purported bad statements about Dr. Shaygan when it included things Ms. Tucker did not say in the DEA-6 report (DEA-6). See id. at 1298.

Once the ball got rolling on this baseless "witness tampering" investigation, the detour from the path to justice veered further. The government identified Mr. Vento and Mr. Clendening to the defense team as merely former Shaygan patients who would serve as neutral witnesses to the facts of the case. In truth, the lead prosecutor directed that Mr. Vento and Mr. Clendening be enlisted to record any conversations they might have with Dr. Shaygan's defense team, see id. at 1304, and Mr. Vento was provided with a recording device for that purpose, id. at 1305.

_____

indictment. Id.

27

Within a few days, Mr. Vento secretly recorded a conversation with Michael Graff, who was the investigator working for Dr. Shaygan's lawyers. Id. Later, at the government's request, but using his own equipment, Mr. Clendening secretly recorded his conversation with David Markus—one of Dr. Shaygan's lawyers. See id. at 1308. These recordings were kept secret from the defense team and the District Court.

The prosecutors violated direct Orders of the Court. Judge Gold ordered the government to give him all DEA-6s so that he could review them, in camera, before the trial began. See id. at 1300–01. Even so, the prosecutors did not turn over the DEA-6 which reported that Mr. Vento had recorded his conversation with Mr. Graff and also documented the DEA agent's interview of Ms. Tucker. See id. at 1306. Neither did the government provide any DEA-6 which reported that Mr. Clendening had recorded his conversation with Mr. Markus. See id. at 1310 (noting the prosecutor "did not disclose that he knew Clendening, who testified for the Government after Vento, was working with [the DEA agent] and that he had agreed to make recordings"). Also not produced was the "crucial DEA-6" reflecting that Mr. Vento had entered into a confidential informant agreement with

the government on January 16, 2009. Id. at 1309.[4] As Judge Gold noted, if these DEA-6 reports had been produced to him as he had ordered, Dr. Shaygan and the Court would have known about the recording of the defense team, and that Mr. Vento and Mr. Clendening were serving as DEA informants, instead of appearing as neutral witnesses. See id. at 1317.

Beyond these violations of the Court's Orders, the prosecutors also violated their duties under Brady, Giglio and the Jencks Act.[5] For example, the prosecutors knew of information given by Dr. Shaygan's patients that was favorable to him, but withheld it. See id. at 1317–18. This was important because it went directly to the prosecution's theory that Dr. Shaygan was not a legitimate doctor. See id. at 1318. Giglio was violated, for example, when the prosecution never disclosed to

[4] Dr. Shaygan's trial began on February 17, 2009. The fact of Mr. Vento's January 16, 2009 confidential informant agreement with the government was not written in the form of a DEA-6 until March 3, 2009, which was during the trial, and after the defense had already learned about Mr. Vento's recording of Mr. Graff. See Shaygan, 661 F. Supp. 2d at 1309.

[5] Judge Gold's fifty-page Order makes so many findings that it is not practical to set them all out here. Beyond what is set out in the main text of this dissent, Judge Gold delineated his findings of (1) instances in which the prosecutors offered live testimony which varied from their own written affidavits previously given to the Court, see Shaygan, 661 F. Supp. 2d at 1302, 1306; (2) instances in which various members of the U.S. Attorney's Office and law enforcement agents gave differing accounts of the same events, see id. at 1302; (3) policies of the U.S. Attorney's Office regarding investigations of opposing counsel being violated, see id. at 1303–04; and (4) members of the U.S. Attorney's Office "casually" discussing with a group of people at dinner, the fact that while he was testifying during Dr. Shaygan's trial, Mr. Clendening blurted out that he had recorded his conversation with Dr. Shaygan's lawyer, when no member of the prosecution had ever disclosed the existence of these recordings to the Court, see id. at 1312–13.

Dr. Shaygan that it had contacted a Florida prosecutor on behalf of Mr. Clendening—who was facing felony drug charges in Florida state court—to communicate that Mr. Clendening had been assisting the federal government in its efforts to prosecute Dr. Shaygan. See id. at 1309. The government violated the Jencks Act, when it possessed recorded statements of Mr. Vento and Mr. Clendening speaking to members of the Shaygan defense team, but did not turn over those statements in connection with Vento and Clendening's testimony at trial. See id. at 1319–20. All this the government failed to do even in the face of specific defense requests for Brady, Giglio and Jencks material, and a standing Court Order to produce it.

## II.

As with the factual inquiry, Judge Gold diligently undertook the responsibility imposed on him by the Hyde Amendment to determine whether this misconduct by the government amounted to a position that was vexatious, frivolous or in bad faith. As I have said, he made findings after hearing oral testimony and receiving written affidavits from all involved. He found generally that the two Shaygan prosecutors "exhibited a pattern of 'win-at-all-cost' behavior . . . that was contrary to their ethical obligations as prosecutors and a breach of their 'heavy obligation to the accused.'" Id. at 1315. Judge Gold's finding in this

30

regard was supported by countless evidentiary details which cannot all be restated here. I will only briefly summarize.

Among Judge Gold's specific findings of bad faith was his finding that the lead prosecutor undertook the surreptitious recordings in the so-called witness tampering investigation "for the bad faith purpose of seeking to disqualify the defense lawyers for conflict-of-interest immediately prior to trial." Id. at 1310. Judge Gold found that the lead prosecutor knew that if key defense lawyers for Dr. Shaygan could be disqualified just before the trial, they would have to step down immediately. See id. at 1311. That "catastrophic" blow, it was hoped, would "force" Dr. Shaygan to plead guilty. Id.

Judge Gold also undertook an extensive discussion of how the lead prosecutor failed to follow either the policies of his U.S. Attorney's Office or the specific instruction given him to remove himself from the investigation he had initiated against opposing counsel. Noting how the strict "taint wall" between the Shaygan prosecution and the investigation of Dr. Shaygan's defense team had been repeatedly breached for "tactical" purposes, id. at 1311, Judge Gold found that the lead prosecutor acted with "implicit bias and in bad faith" in this regard as well. Id. at 1302.

Judge Gold drew a "strong inference[]" that the Superseding Indictment adding 118 counts to the twenty-three counts of the original indictment was "significantly motived by ill-will." Id. at 1298. Judge Gold found that the addition of so many charges was designed to compel a guilty plea from Dr. Shaygan by "greatly increas[ing] the time and cost of the trial" and by delaying the trial so as to prolong the "strict conditions of house arrest" which were exacting a heavy psychological toll on Dr. Shaygan. Id.

Finally, Judge Gold found that the prosecution's failure to turn over the DEA-6 documenting that Mr. Vento had recorded the defense team was "knowing and in bad faith." Id. at 1306. He found that the prosecution's failure to turn over the DEA-6 report of the interview of Ms. Tucker was "willful, vexatious and in bad faith." Id. at 1301. These actions and many others, Judge Gold concluded, were "conscious and deliberate wrongs" arising from "the prosecutors' moral obliquity." Id. at 1321. And far from isolated wrongs, he emphasized, they fit into a "pattern" of desperate conduct designed to save a case that had become weak from getting even weaker. See id. at 1315, 1322. It was this pattern of

misconduct that led Judge Gold to conclude sanctions were warranted. See id. at 1321–22.[6]

## III.

As I have said, this Court's opinion in Shaygan does not set aside the findings of fact that undergirded Judge Gold's Hyde Amendment analysis. Indeed, the opinion assumes that the prosecutors did and said everything that Judge Gold found to be true. See Shaygan, 652 F.3d at 1311, 1315–16. Neither does it point to error in Judge Gold's findings of fact that the prosecutors acted in violation of their ethical obligations as representatives of our government. See id.[7] Rather, the opinion assumes that the only factor that reflects the position of the government (other than the narrow exception I have mentioned) is the basis for the charges against the defendant. See id. at 1311–16. This astoundingly narrow reading of the term "the position of the United States" collapses the Hyde Amendment inquiry into only a single question: were the charges against the

---

[6] This Court's Shaygan opinion implies that the District Court rested the award on "discovery violations alone." 652 F.3d at 1315. That is a plainly incorrect characterization of Judge Gold's Hyde Amendment analysis. Judge Gold found that the sum total of the prosecutors' conduct supported the award.

[7] Judge Pryor says in his concurrence that Judge Gold's findings of misconduct "were vacated by the unanimous panel." Concurring Op. at 12. However, I do not read the panel opinion this way. The only thing that the majority opinion does is to question in passing the reliability of the record after vacating the public reprimands on due process grounds. See Shaygan, 652 F.3d at 1319.

defendant baseless?  See id. at 1311–13.  If the answer to that question is no, then "the prosecution is objectively reasonable," and the Hyde Amendment inquiry comes to an abrupt halt.  Id. at 1317.

Applying this test, the opinion concludes that solely because probable cause supported the charges in the Superseding Indictment, the prosecution of Dr. Shaygan was "objectively reasonable" and therefore not in bad faith.  See id. at 1313, 1315–16.  This approach makes all of the prosecutorial misconduct found by Judge Gold irrelevant.  And by this route, the opinion reaches the remarkable holding that the District Court had "no discretion to award Shaygan attorney's fees and costs."  Id. at 1317 (emphasis added).  Yet, this holding contradicts what Congress said when it passed the Hyde Amendment and renders the statute incapable of doing what Congress intended.  As a result, and not surprisingly, it marks an unwarranted departure from the decisions of our sister Circuits and from Supreme Court precedent.

In passing the Hyde Amendment Congress sought to respond to patterns of prosecutorial misconduct, including instances where prosecutors "keep information from [the defendant] that the law says they must disclose," "hide information" and "suborn perjury."  143 Cong. Rec. H7786-04, at H7791 (daily

34

ed. Sept. 24, 1997) (statement of Rep. Hyde).[8]  Thus, it seems Congress clearly

understood that the presence of probable cause does not, and should not, excuse

patterns of gross prosecutorial misconduct.  Indeed, the legislative history

expressly reflects that "a grand jury finding of probable cause to support an

indictment <u>does not</u> preclude a judge from [awarding attorney's fees]."  H.R. Rep.

No. 105-405, at 194 (1997) (Conf. Rep.), <u>reprinted in</u> 1997 U.S.C.C.A.N. 2941,

3045 (emphasis added).

To ensure that the basis for the charges alone does not limit the availability

of sanctions, Congress adopted the term "the position of the United States" from

the Equal Access to Justice Act (EAJA).  <u>See</u> <u>United States v. Gilbert</u>, 198 F.3d

1293, 1300 (11th Cir. 1999) (noting that Congressman Hyde "patterned his

amendment after" the EAJA).  The EAJA provides for attorneys fees to litigants

who prevail against the United States in civil cases where the government's

position is not "substantially justified."  <u>See</u> 28 U.S.C. § 2412(d)(1)(A).  By the

time Congress was considering Congressman Hyde's proposal, and in the context

---

[8] Remarkably, Judge Pryor's concurrence to the denial of en banc review says that Congressman Hyde's statements are irrelevant as to what his own proposal means.  <u>See</u> Concurring Op. at 16–18.  Judge Pryor emphasizes that Congressman Hyde's statements were made in support of an earlier version of the Amendment.  <u>Id.</u> at 17.  But, while Congress made several changes to the statutory text between the first and final versions of the Hyde Amendment, none had anything to do with the meaning of the term "the position of the United States," which remained unchanged throughout the legislative process.  <u>See</u> <u>United States v. Gilbert</u>, 198 F.3d 1293, 1299–1302 (11th Cir. 1999).

of awarding attorneys fees against the government, the term "the position of the United States" had acquired a specific meaning. In Commissioner, INS v. Jean, 496 U.S. 154, 110 S. Ct. 2316 (1990), the Supreme Court held that the term requires a court to consider "a case as an inclusive whole." Id. at 161–62, 110 S. Ct. at 2320.

Based on this expansive interpretation of the term "position," the First Circuit has recognized that, under the Hyde Amendment, an award may properly be based on "an array of government conduct both before the indictment and during litigation." United States v. Knott, 256 F.3d 20, 31 (1st Cir. 2001). In the same way, the Sixth Circuit has observed that under the Hyde Amendment, "[w]hen assessing whether the position of the United States was vexatious, frivolous, or in bad faith, the district court should [evaluate] the case as an inclusive whole." United States v. Heavrin, 330 F.3d 723, 730 (6th Cir. 2003) (quotation marks omitted). Rejecting the idea that the Hyde Amendment contemplates "a precise litmus test," the Sixth Circuit cautioned that courts "must not fail to see the forest for the trees." Id.

Decisions from other Circuits also reflect that the term "position" requires a court to examine "a case as an inclusive whole," Jean, 496 U.S. at 161–62, 110 S. Ct. at 2320. See, e.g., United States v. Porchay, 533 F.3d 704, 707–08, 711 (8th

36

Cir. 2008) (examining whether government conduct following the dismissal of the indictment was in bad faith); United States v. Manchester Farming P'ship, 315 F.3d 1176, 1185–86 & n.25 (9th Cir. 2003) (examining whether government conduct both after the indictment was filed and during trial demonstrated bad faith).

This Circuit stands alone in its now established rule that in order to discern "the position of the United States," a court need only examine the basis for the charges. See Shaygan, 652 F.3d at 1312–16. I find great irony in that, under our rule, the type of misconduct Congressman Hyde specifically decried in urging his colleagues to adopt his amendment is now beyond the scope of the law. This new and myopic view of what constitutes "the position of the United States" under the Hyde Amendment leads to a particularly shocking result in this case. For me this is most plainly manifested in the Court's conclusion that these prosecutors' pattern of conduct—only part of which I have described here—was "objectively reasonable." Id. at 1317. I have no doubt this pattern of wrongs, undertaken to save a failing case, amounted to "the position of the United States."

IV.

In closing, I must say that I realize there are few less popular classes of people for whom to advocate than those charged with federal crimes. One might

say that a person, like Dr. Shaygan, who has been acquitted has nothing to complain about. But Congress thought differently. The rules that govern our criminal justice system have developed over the life of our country to allow those accused of crimes to know the evidence against them; to be advised of the weaknesses in that evidence; and to be able to confront the witnesses against them with full knowledge of information which might color their testimony. Just like the rest of us, Dr. Shaygan was constitutionally entitled to all of this as he faced the serious charges leveled against him. The government violated Dr. Shaygan's rights, and now, contrary to what Congress has provided, he is left alone to pay the costs he suffered at the hands of these rule breakers.

It also strikes me as dangerous to render trial judges mere spectators of extreme government misconduct. By enacting the Hyde Amendment, Congress gave trial judges the responsibility to determine whether "the position of the United States was vexatious, frivolous, or in bad faith." I say Judge Gold performed that unpleasant duty admirably, and he had every reason in law to expect that his Order would be affirmed. Indeed, this Court has said "prosecutors must expect that this court will support district judges who take reasonable steps to correct prosecutorial conduct that is not right." United States v. Wilson, 149

F.3d 1298, 1304 (11th Cir. 1998).  This Court's decision not to reconsider this

case <u>en banc</u> forsakes that principle.  I respectfully dissent.